# HANDLEY *v.* STUTZ.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE MIDDLE DISTRICT OF TENNESSEE.

No. 1516. Submitted January 12, 1891. — Decided March 30, 1891.

The failure to enter a vote of stockholders in a corporation in the corporation records at the time when it was adopted does not affect its validity.

A resolution of stockholders in a corporation organized under the laws of Kentucky to increase the capital stock of the corporation, passed at a meeting held without the limits of that State, is binding upon the members present and voting for it.

An increase by a Kentucky corporation of its capital stock within the amount authorized by law is not invalidated by reason of the fact that no amendment of the charter authorizing such increase was ever recorded or published as required by the laws of that State.

When a stockholder in a corporation who assents to an increase in the capital stock of the corporation and its gratuitous distribution among the shareholders, receives such stock as full paid stock, an obligation arises to pay for it in full, when called upon to do so by creditors whose debts are subsequent to the authorization of the increase: but this equity does not exist in favor of a creditor whose debt was contracted prior to such authorization.

An active corporation, finding its original capital impaired by loss or misfortune, may, for the purpose of recuperating itself, and of producing new conditions for the successful prosecution of its business, issue new stock, and put it upon the market, and sell it for the best price that can be obtained: and in such case no such trust in favor of a creditor arises against the purchaser who, in good faith, buys for less than par.

THIS was a bill in equity, filed by Sebastian Stutz, of Pittsburg, Pa., by certain other persons composing the firm of Ragon Brothers, of Evansville, Indiana, and by others composing the firm of Louis Stix & Co., of Cincinnati, Ohio, on behalf of themselves and such other creditors of the Clifton Coal Company as should come in and contribute to the expenses of the suit, against the Clifton Coal Company and certain of its stockholders, to compel an assessment upon certain shares of stock held by the individual defendants, and payment of the same as a trust fund for the satisfaction of the debts of the company. The bill averred in substance that the Clifton Coal Company was incorporated under the laws of the State of Kentucky, in July, 1883, with power to purchase, lease and operate coal mines in the State of Kentucky, a copy of the articles of incorporation being annexed to the bill; that by said articles the capital stock of such corporation was fixed at $120,000, divided into shares of $100 each, with power to increase the same to $200,000, by a majority vote of the stockholders; that all the stock was then taken and paid for by the subscribers in some manner agreed upon between them; that, pursuant to the authority contained in the articles of incorporation, the stockholders, all of them being present and voting, "at a meeting duly held for the purpose in May, 1886, unanimously resolved and ordered that the capital stock of said company be, and in fact it was, then increased to $200,000, in shares of $100 each, being an increase of 800 shares of stock of said company;" that of the 800 shares then created, the defendant Handley subscribed for 86¾ shares, two of the other defendants for 15 shares each, and two others for 75 shares each, certificates of which were issued by the company, and delivered to, and received by, said subscribers, as they were respectively entitled; but that neither one of them ever paid to the company any part of the said shares, and they each, respectively. owe the said company the full par value of the shares of the said capital stock subscribed for and issued to them.

The bill also averred that on December 30, 1886; it having been previously resolved to issue bonds to the amount of

$50,000, and to secure the payment thereof by a mortgage upon its property, and said mortgage having been executed to trustees and recorded, a contract was executed and delivered to the company by certain others of the defendants, whose names were subscribed thereto, in the following terms: "We, the undersigned, subscribe for the amount set opposite our names, respectively, to bonds of the Clifton Coal Company, aggregating $50,000. It is agreed that $50,000 capital stock be distributed *pro rata* among the subscribers to the above bonds;" that several of the defendants subscribed to this contract, and agreed to take bonds in different amounts; that said subscribers paid the coal company for the bonds, and that with the money thus received, to the extent of $30,000, the company paid its debts to certain of its officers and managers, who had become liable by endorsement for the company, and that nothing was or ever had been paid for or upon any of the shares of capital stock thus subscribed for, and to be distributed among them; that is to say, $50,000 of said capital stock, equivalent to 500 shares thereof, was in fact subscribed for and distributed among certain of the defendants, to whom, in May, 1887, there were issued and received by them respectively certificates for shares.

The bill further averred that the plaintiffs were judgment creditors of the company, by judgments obtained in the courts of Kentucky; that their debts were created before all of the capital stock of said company was paid in; and that all of said $80,000 increase of the capital stock, and each and all of the amounts due to the company for any part of its capital stock, constituted a trust fund for their benefit, which they were entitled to have administered in a court of equity to the satisfaction of their said debts, the company being insolvent.

It further appeared from the testimony that the company was organized soon after its articles of incorporation were filed; that its chief office was at Mannington, Kentucky; and that it began business at once and made large outlays and expenditures for machinery, buildings, materials and labor. In the early part of the year 1886, the company was led to believe that its coal would coke, and, therefore, its products

could be profitably extended from grate and steam purposes to iron-making coke. To embark in the manufacture of coke, however, money was needed, and a meeting of the stockholders was held March 31, 1886, at which a resolution was passed, reciting that $50,000 was needed with which to erect coke ovens, buildings, improvements, etc., to further develop the property ; and it was unanimously resolved to issue $50,000 of bonds of the company, in sums of $1000 each, due thirty years from April 1, with 6 per cent interest, and secured by a trust mortgage upon the property of the company, and the president was authorized to dispose of such bonds as in his discretion seemed best. The mortgage was executed to the designated trustee and recorded. It was found, however, that the bonds could not be sold, and to meet the demands upon the company for money, it borrowed a large amount upon its notes, endorsed by its directors and stockholders, and to secure the lenders and endorsers, the $50,000 of bonds were deposited in two banks in Nashville, Tennessee, as additional collateral security for the loans. Finding that no one would purchase the bonds, and being advised that in order to effect their sale it would be better to add an equal amount of stock to the bonds, and propose to the purchasers of such bonds to give as a gratuity $1000 of stock with each $1000 bond, a meeting of the stockholders of the company was held at Nashville, May 31, 1886, at which all the stockholders were present in person or by proxy, although without any call or previous notice, and "it was unanimously resolved that the capital stock of the company be increased to $200,000, as authorized by the charter." This resolution was not then entered upon the records of the corporation, but was formulated in the shape of a pencil memorandum, and adopted unanimously, although no vote appeared to have been taken, and no formal record was made of the meeting until the summer of 1888. No notice of such change in the amount of its capital stock was recorded or published, as required by the laws of Kentucky. The subscribers to the bonds subsequently executed the agreement set forth in the bill, and bonds to the amount of $45,000 were delivered to the subscribers with equal amounts of certificates of "paid

up " stock, the receipts reciting that it " was issued with bonds for same amount, as per agreement." The certificates on their face recited that the shares of stock were fully paid up " and were non-assessable," or language to that effect. Five thousand dollars of the bonds were left in one of the national banks at Nashville as collateral security for a loan to the company, no one having subscribed for them. The remaining $30,000 shares of increased stock, which were not needed to secure the subscribers to the bonds, appeared to have been distributed *pro rata* among the old stockholders. In the latter part of 1887, and in the early part of the following year, plaintiffs obtained judgments against the company, which were unsatisfied, and in September, 1887, by an order of the Circuit Court of Hopkins County, Kentucky, the entire property of the company was placed in the hands of a receiver, and its operations stopped.

On February 8, 1889, this bill was filed against the coal company and the holders of this increased stock, to compel payment therefor, and to recover the amounts of the judgments against the company. The court dismissed the bill as to three of the defendants not served with process, and as to the rest held them liable to all the creditors of the company whose debts originated after the alleged increase of stock, and fixed May, 1886, as the date of such increase. As to debts contracted prior to that date, they were excluded because, as between the company and the stockholders, the latter held such stock properly, and without liability to the company, and all creditors who dealt with the company prior to such increase, and not upon the faith of such stock, had no equity to demand more than the company itself could. Five of the defendants against whom decrees were rendered in excess of $5000 appealed to this court, and the Circuit Court suspended the execution of the decree as to those who could not appeal, until this court should determine the rights of the appellants.

The opinion of the Circuit Court is reported in 41 Fed. Rep. 531.

*Mr. Edward H. East* and *Mr. James Stuart Pilcher* for appellants.

*Mr. Walter Evans* and *Mr. James R. MacFarlane* for appellees.

Mr. Justice Brown delivered the opinion of the court.

1. Although the resolution of May 31, 1886, increasing the stock of the company from $120,000 to $200,000, was not formally entered at that time upon the books of the company, and nothing but a pencil memorandum was then made of the proceedings of the meeting, no objection can be taken to its validity by reason of such omission. The testimony shows clearly what took place at this meeting. It appears from the memorandum made by Mr. Allen, the acting secretary, to have been " unanimously resolved that the capital stock of the company be increased to $200,000 as authorized by the charter, the purposes for which said stock is issued being the betterment of the present plant, and the construction of a new plant for coking purposes." This resolution was subsequently, and in 1888, when the omission to record the same appears to have been first discovered, formally entered upon the minute book of the corporation. The failure to enter this resolution at the time it was adopted did not affect its validity, as most corporate acts can be proved as well by parol as by written entries. *Moss* v. *Averell*, 10 N. Y. 449.

2. Nor were the proceedings of such meeting any less binding upon those participating in it by reason of the fact that it was held without call or notice, and outside the boundaries of the State under the laws of which the company was incorporated. By an act of the legislature of Kentucky of March 3, 1876, General Statutes, page 769, "all elections for directors and other officers, by private corporations, etc., shall be held within the territorial limits of the State of Kentucky. . . . Any such elections held outside of Kentucky shall be void." Beyond the election of officers, however, there is no statutory restriction of corporate action to the limits of the State, and in the absence of such inhibition the proceedings of such meeting would, within the rule laid down by this court in *Galveston Railroad* v. *Cowdrey*, 11 Wall. 459, with regard to directors'

meetings, be binding upon all those participating in it, as well as upon those acting upon the faith of its validity, or receiving stock authorized to be issued at such meeting. It is true there are cases holding that stockholders' meetings cannot be legally held outside of the home state of the corporation, but the question has generally arisen where a majority present at such meeting had attempted by their action to bind a dissenting minority, or had taken action prejudicial to the rights of third persons. *Ormsby* v. *Vermont Copper Mining Co.*, 56 N. Y. 623; *Hilles* v. *Parrish*, 14 N. J. Eq. (1 McCarter,) 380. Indeed, so far as we know, the authorities are uniform to the effect that the action taken at such meetings is binding upon those who participate in or take the benefit of them. *Heath* v. *Silverthorn Lead Mining Co.*, 39 Wisconsin, 146. In this case the meeting was attended by all the stockholders but two, who were represented by proxy, the vote increasing the stock was unanimous, and it does not lie in the mouth of those who participated in this act, or received the stock voted at this meeting, to question its validity.

3. It is further claimed that this issue of stock was invalid by reason of the fact that there was no amendment of the charter authorizing such increase ever recorded or published, as required by the law of Kentucky. The proceeding for the organization of incorporated companies is found in chapter 56 of the General Statutes of Kentucky, the fifth section of which requires a notice to be published for at least four weeks in some newspaper as convenient as practicable to the principal place of business, specifying several particulars, among which is the amount of capital stock authorized, and the times when, and the conditions upon which, it is to be paid in. Section six is as follows : " The corporation may commence business as soon as the articles are filed for record in the office of the county court clerk, and their acts shall be valid if the publication in a newspaper is made, and the copy filed in the office of the Secretary of State, when such filing is necessary, within three months from such filing in the clerk's office. No change in any of the foregoing particulars shall be valid, unless recorded and published as the original articles are required to

be ; nor shall any change be made at any time or in any manner which would be inconsistent with the provisions of this act." Reliance is placed upon the final clause of this section, for the position assumed by the defendants, that the increase in the capital stock never having been recorded or published, as required by this clause, was void, and the case of *Scovill* v. *Thayer*, 105 U. S. 143, is cited in support of this contention. That was also an action to recover unpaid assessments upon stock. The statutes of Kansas provided that any corporation might increase its capital stock to any amount, not exceeding double the amount of its authorized capital. The corporation in question had increased its capital stock, as it was authorized to do, by doubling it, and it subsequently increased it by doubling it again, thus quadrupling the original amount, the defendant in the case having attended by proxy the meeting at which such illegal increase was voted, and received a quantity of the stock thus issued. It was held that such increase was *ultra vires* and void, and that the defendant was not estopped from denying the validity of the over-issue, or his obligation to pay for it.

In the case under consideration, however, the articles of incorporation did provide that the capital stock should be $120,000, with power to increase to $200,000 by a majority vote of the stockholders, and there was no statutory inhibition, as in Kansas, against any such increase as it might be thought advisable to make. Here, then, was the power to increase the capital stock to the precise amount fixed by the stockholders, at their meeting at Nashville, and the defect was merely in the failure to record and publish such change, as required by section six of the statute in question.

It is insisted by the appellees, and the learned judge of the Circuit Court so held, that the failure to record and publish this increase of the capital stock, which was in fact, if not in name, an amendment to the original articles, which had fixed the capital stock at $120,000, was a mere irregularity and informality in the proceedings to effect the increase; such a one, as was said by this court, in *Chubb* v. *Upton*, 95 U. S. 665, 667, to constitute no defence to a subscriber to such increased

stock. In that case it appeared only that objection was made to the proceedings by which the company increased its stock, on the ground of irregularity and informality in the papers filed in the public offices; and it was held that one who contracted with an acting corporation, by purchasing stock in the same, could not defend himself against a claim upon such contract, in a suit by the corporation, by urging the illegality of its organization. In *Veeder* v. *Mudgett*, 95 N. Y. 295, 310, which was also an action by directors against stockholders of a corporation to enforce the liability imposed upon them because of an alleged failure to pay in the full amount of the capital stock, it appeared that the meeting at which the increased stock was voted was not formally called, nor was a certificate of the increase of capital made and filed as prescribed by the state statute. The stock was, however, all issued to stockholders who voted for the increase. These holders subsequently received dividends thereon, voted at stockholders' meetings, and in all respects were treated and acted as stockholders. The court held the attempted increase illegal, but that the defendant stockholders, as against the creditors of the company, by accepting their proportions of the increased stock, by voting for its increase, by taking dividends upon it, and by holding it out to those dealing with the company as an actual component of its capital, were estopped from denying the validity of the increase. It was argued in that case, as it is in this, that an act absolutely and wholly void, because incapable of being performed, could not be made valid by estoppel. But this was held to be true only where there was an entire lack of power to do the act so brought in question, and the case of *Scovill* v. *Thayer* was cited. "But where," says the court, "as in the present case, the abstract power did exist, and there was a way in which the increase could lawfully be made, and the creditors could, without fault, believe that the increase had been lawfully effected, and the necessary steps had been taken, there the doctrine of estoppel may apply, and the increased stock be deemed valid as against the creditors who have acted upon the faith of such increase."

It is true that in neither of those cases was the court embar-

rassed by a statute declaring that certain conditions must be observed or the increase would not be valid. But we think that the clause of section 6, upon which reliance is placed, must be read in connection with section 18 of the same act, which provides that "no persons, acting as a corporation under the provisions of this act, shall be permitted to set up or rely upon the want of legal organization as a defence to an action brought against them as a corporation; nor shall any person who may be sued on a contract made with such corporation, or sued for an injury done to its property, or for a wrong done to its interests, be permitted to rely upon such want of legal organization in his defence." It is true that this section seems to apply rather to a want of an original legal organization of the company; but we think it should be regarded as applying as well to amendments to such organization, and that no defence connected with the original organization, which a party contracting with the corporation would be disqualified to set up, can be made available in connection with an amendment to the original articles.

So far as the question of liability to the proposed assessments is concerned, these defendants, with respect to their relations to this corporation, are divisible into two distinct classes: First, those of the original stockholders who received the $30,000 increased stock as a gift; second, those who subscribed to the $50,000 bonds, and received an equal amount of stock, as a bonus or inducement to make the subscription.

4. With regard to the first class, namely, the original stockholders, who voted for this increase of 800 shares, and then distributed among themselves 300 of those shares, without the shadow of right or consideration, it is difficult to see why they should not be called upon to respond for their value. The only claim made upon their behalf is that they never agreed to contribute or pay for the same; that the stock was expressly declared to be "fully paid" and "free from all claims or demands upon the part of the company;" that there was no evidence that the creditors of the company knew of, or relied upon, this increase, in their dealings with the company; and that they had a right to return and surrender the same,

which they offered to do. There is no reason to suppose that these stockholders did not act in good faith, and in the belief that they were entitled to this stock. The fact that they did not subscribe for it or agree to take it until the receipt of the certificates, is immaterial, as the acceptance of the certificates is sufficient evidence of an agreement to pay their par value. *Sanger* v. *Upton*, 91 U. S. 56, 64; *Chubb* v. *Upton*, 95 U. S. 665; *Brigham* v. *Mead*, 10 Allen, 245.

Ever since the case of *Sawyer* v. *Hoag*, 17 Wall. 610, it has been the settled doctrine of this court that the capital stock of an insolvent corporation is a trust fund for the payment of its debts; that the law implies a promise by the original subscribers of stock who did not pay for it in money or other property to pay for the same when called upon by creditors; and that a contract between themselves and the corporation, that the stock shall be treated as fully paid and non-assessable, or otherwise limiting their liability therefor, is void as against creditors. The decisions of this court upon this subject have been frequent and uniform, and no relaxation of the general principle has been admitted. *Upton* v. *Tribilcock*, 91 U. S. 45; *Sanger* v. *Upton*, 91 U. S. 56; *Webster* v. *Upton*, 91 U. S. 65; *Chubb* v. *Upton*, 95 U. S. 665; *Pullman* v. *Upton*, 96 U. S. 328; *County of Morgan* v. *Allen*, 103 U. S. 498; *Hawkins* v. *Glenn*, 131 U. S. 319; *Graham* v. *Railroad Co.*, 102 U. S. 148, 161; *Richardson* v. *Green*, 134 U. S. 30.

It is simply in affirmance of this general principle that section 14, chapter 56, of the General Statutes of Kentucky declares that nothing in the act conferring corporate franchises, or permitting the organization of corporations "shall exempt the stockholders of any corporation from individual liability to the amount of the unpaid instalments on stock owned by them." If the corporation has no right as against creditors, to sell or dispose of this stock with an agreement that no further assessment shall be made upon it, much less has it the right to give it away, or distribute it among shareholders, without receiving a fair equivalent therefor, and thereby induce the public to deal with it upon the credit of such shares, as representing the assets of the corporation. *Union Mut.*

*Life Ins. Co.* v. *Frear Stone Mfg. Co.,* 97 Illinois, 537. The stock of a corporation is supposed to stand in the place of actual property of substantial value, and as being a convenient method of representing the interest of each stockholder in such property, and to the extent to which it fails to represent such value it is either a deception and fraud upon the public, or an evidence that the original value of the corporate property has become depreciated. The market value of such shares rises with an increase in the value of the corporate assets, and falls in case of loss or misfortune, whereby the value of such assets is impaired. And the increase of value of such stock is taken to represent either an appreciation in value of the company's property beyond the par value of the original shares, or so much money paid to the corporation as is represented by such shares. If it be once admitted that a corporation may issue stock without receiving a consideration therefor, and where it does not represent actual or substituted value in corporate assets, there is apparently no limit to the extent to which the original stock may be "watered," except the caprice of the stockholders. While an agreement that the subscribers or holders of stock shall never be called upon to pay for the same may be good as against the corporation itself, it has been uniformly held by this court not to be binding upon its creditors.

5. Somewhat different considerations apply to those who subscribed for the bonds of the company, with the understanding that they were to receive an amount of stock equal to the bonds as an additional inducement to their subscription. The facts connected with this transaction are substantially as follows: Some three years after the company was organized it became apparent that the enterprise, as originally contemplated, namely, the mining and selling of coal for steam and domestic purposes, was not likely to be a success, owing to the inferior character of the product; and the only hope of the company lay in the manufacture of the coal into an iron-making coke, that is, a coke containing a percentage of sulphur low enough to admit of the manufacture of merchantable pig iron. To embark in this, however, money was needed, and as

the stock of the company was not worth more than 50 cents on the dollar, it was evident this could not be effected simply by the issue of new stock. It was proposed at the meeting in March that money should be raised by the issue of $50,000 of bonds, with which to add the requisite structures to the plant. But it was soon evident that the bonds could not be negotiated without the stock, and, acting upon the suggestion of a Nashville banker, it was resolved at the meeting in May that the stock should be increased 800 shares, 500 of which should be turned over to the subscribers to the bonds, as a bonus or an additional consideration. The evidence is uncontradicted that the bonds could not have been negotiated without the stock; that they were both sold as a whole; that the transaction was in good faith, and, considering the risk that was taken by the subscribers, the price paid for the stock and bonds was fair and reasonable. The directors appear to have done all in their power to obtain the best possible terms, and there is no imputation of unfair dealing on the part of any one connected with the transaction. At that time the mines and property of the company were in good condition, and the prospects of success were fair.

The case then resolves itself into the question whether an active corporation, or as it is called in some cases, a "going concern," finding its original capital impaired by loss or misfortune, may not, for the purpose of recuperating itself and providing new conditions for the successful prosecution of its business, issue new stock, put it upon the market and sell it for the best price that can be obtained. The question has never been directly raised before in this court, and we are not, consequently, embarrassed by any previous decisions on the point. In the *Upton Cases,* arising out of the failure of the Great Western Insurance Company; in *Hatch* v. *Dana,* 101 U. S. 205, and in *Hawkins* v. *Glenn,* 131 U. S. 319, the defendants were either original subscribers to the increased stock, at a price far below its par value, or transferees of such subscribers; and the stock was issued, not as in this case to purchase property or raise money to add to the plant, and facilitate the operations of the company, but simply to increase its original stock

in order to carry on a larger business, and the stock thus issued was treated as if it formed a part of the original capital. In *County of Morgan* v. *Allen*, 103 U. S. 498, the same principle was applied to a subscription by a county to the capital stock of a railroad company, for which it had issued its bonds, although such bonds had been surrendered to the county with the consent of certain of its creditors.

To say that a corporation may not, under the circumstances above indicated, put its stock upon the market and sell it to the highest bidder, is practically to declare that a corporation can never increase its capital by a sale of shares, if the original stock has fallen below par. The wholesome doctrine, so many times enforced by this court, that the capital stock of an insolvent corporation is a trust fund for the payment of its debts, rests upon the idea that the creditors have a right to rely upon the fact that the subscribers to such stock have put into the treasury of the corporation, in some form, the amount represented by it; but it does not follow that every creditor has a right to trace each share of stock issued by such corporation, and inquire whether its holder, or the person of whom he purchased, has paid its par value for it. It frequently happens that corporations, as well as individuals, find it necessary to increase their capital in order to raise money to prosecute their business successfully, and one of the most frequent methods resorted to is that of issuing new shares of stock and putting them upon the market for the best price that can be obtained; and so long as the transaction is *bona fide*, and not a mere cover for " watering " the stock, and the consideration obtained represents the actual value of such stock, the courts have shown no disposition to disturb it. Of course no one would take stock so issued at a greater price than the original stock could be purchased for, and hence the ability to negotiate the stock and to raise the money must depend upon the fact whether the purchaser shall or shall not be called upon to respond for its par value. While, as before observed, the precise question has never been raised in this court, there are numerous decisions to the effect that the general rule that holders of stock, in favor of creditors, must respond for its par

value, is subject to exceptions where the transaction is not a mere cover for an illegal increase.

Thus in *New Albany* v. *Burke*, 11 Wall. 96, a city subscribed to the stock of a railroad, and issued bonds for a part of the subscription, agreeing to issue them for the rest of it, when the road should be built to a certain point. The road relied mainly upon these bonds to raise the necessary money. The validity of the bonds being denied by taxpayers, who had filed bills to enjoin the raising of a tax to pay the interest, their value in the market was largely impaired, and it was found they could not be sold without a sacrifice. Under these circumstances the company applied to the city to pay a certain sum which had been borrowed by the road upon the pledge of the bonds already issued, with sundry other moneys, and in consideration thereof the city obtained from the company a large number of bonds which had not been negotiated, and a cancellation of the subscription. In a suit brought by a judgment creditor to enforce the original subscription, it was held that the compromise was legal, and the payment of such subscription would not be enforced, although it subsequently turned out that the bonds were worth more than they could have been sold for. Said Mr. Justice Strong, speaking for the court: "Had the company sold to a stranger, and then the city become a purchaser from the stranger, it will not be contended that any creditor of the company could complain. And it can make no difference whether the purchase was made directly or indirectly from the first holder of the bonds, assuming that there was no fraud. The transaction . . . was, in substance, plainly nothing more than a purchase by the city of its own bonds, some of which had been issued and others of which it was under obligation to issue, at the call of the vendor. . . . Looking at it in the light of subsequent events, it was no doubt an advantageous purchase for the city; and, if the uncontradicted evidence is to be believed, it was deemed at the time an advantageous sale or arrangement for the company. . . . We may add, the evidence is convincing that the contract between the city and the company was made in the utmost good faith, with no intention to wrong

creditors of the latter; that it was at the time considered advantageous to the company, and it is not proved that all was not paid for the bonds issued and to be issued that they could have been sold for in the market."

So in *Coit* v. *Gold Amalgamating Company*, 119 U. S. 343, it was held that where the charter of a corporation authorizes the capital stock to be paid for in property, and the shareholders honestly and in good faith pay for their subscriptions in property instead of money, third parties have no ground of complaint, although a gross and obvious over-valuation of such property would be strong evidence of fraud in an action by a creditor to enforce personal liability. The court held that where full-paid stock was issued for property received there must be actual fraud in the transaction to enable creditors of the corporation to call the stockholders to account. In delivering the judgment of the court in that case at the circuit, 14 Fed. Rep. 12, Mr. Justice Bradley observed: "That trust (in favor of creditors) does not arise absolutely in every case where capital stock has been issued, and where it has been settled for by arrangement with the company. It is not as if the stockholders had given their promissory notes for the amount, these notes being in the treasury of the company; but there are often equities to which the stockholders are entitled — on which they are to stand." As one of them, he mentioned the case of stock dividends fairly made in consideration of profits earned and of accumulations of the property of the company, and observed: "It is not true that it is in the power of a creditor in every case, and in all cases, as a mere matter of right, to institute an inquiry as to the valuation of the amount of the consideration given for the stock, and disturb fair arrangements for its payment in other ways than by cash. If the stock has been fairly created and paid for, there is an end of trusts in favor of anybody; and this does not affect the general proposition that unpaid subscriptions of stock are a trust fund to be administered for the benefit of creditors after a corporation becomes insolvent."

A case nearer in point is that of *Clark* v. *Bever, ante,* 96, decided at the present term of this court. In this case, a rail-

road company, of which defendant's intestate was president
and stockholder, had a settlement with a construction com-
pany, of which defendant's intestate was also a member, for
work done in building the road.    The railroad company, being
unable to pay the claim of the construction company, delivered
to it thirty-five hundred shares of its stock at 20 cents on the
dollar, and the same were accepted in full satisfaction of the
debt.    The stock was not worth anything in the market, and
was issued directly to the defendant's intestate.    No other
payment than the 20 per cent was ever made on account of
this stock.    A judgment creditor of the railroad company filed
a bill to compel the payment by the defendant of his claim,
upon the theory that he was liable for the actual par value of
such stock, whatever may have been its market value at the
time it was received.    It was held he could not recover.    " Of
course, under this view," says Mr. Justice Harlan, in delivering
the opinion of the court, " every one having claims against the
railway company, — even laborers and employés, — who could
get nothing except stock in payment of their demands, became
bound, by accepting stock at its market value in payment, to
account to unsatisfied judgment creditors for its full face value,
although, at the time it was sought to make them liable, the
corporation had ceased to exist, or its stock had remained, as
it was when taken, absolutely worthless.    .   .   .   To say that
a public corporation, charged with public duties, may not re-
lieve itself from embarrassment by paying its debt in stock at
its real value — there being no statute forbidding such a trans-
action, — without subjecting the creditor, surrendering his debt,
to the liability attaching to stockholders who have agreed, ex-
pressly or impliedly, to pay the face value of stock subscribed
by them, is, in effect, to compel them either to suspend oper-
ations the moment they become unable to pay their current
debts, or to borrow money secured by mortgage upon the
corporate property."

So in *Fogg* v. *Blair*, *ante*, 118, also decided at the present
term, it was held to be competent for a railroad, exercising
good faith, to use its bonds or stock in payment for the con-
struction of its road, although it could not, as against creditors

or stockholders, issue its stock as fully paid without getting some fair or reasonable equivalent for it. It was there said: "What was such an equivalent depends primarily upon the actual value of the stock at the time it was contracted to be issued, and upon the compensation which, under all the circumstances, the contractors were equitably entitled to receive for the particular work undertaken or done by them." It appeared in that case that full and adequate compensation for the work done had been paid by the company in its mortgage bonds, and, as the bill contained no allegation whatever as to the real or market value of such stock, it was held that the contractors receiving this stock were not liable to creditors for its par value. It was added: "If, when disposed of by the railroad company, it was without value, no wrong was done to creditors by the contract made with Blair and Taylor. If the plaintiff expected to recover in this suit on the ground that the stock was of substantial value, it was incumbent upon him to distinctly allege facts that would enable the court — assuming such facts to be true — to say that the contract between the railroad company and the contractors was one which, in the interest of creditors, ought to be closely scrutinized." It would seem to follow from this that if the stock had been of some value, that value, however much less than par, would have been the limit of the holder's liability.

In *Morrow* v. *Nashville Iron and Steel Co.*, 87 Tennessee, 262, 275, 276, the Supreme Court of Tennessee held, that a contract with a subscriber to stock of a corporation, that for every share subscribed he should receive bonds to an equal amount, secured by mortgage on the company's plant, is void as against creditors, and also between the subscriber and the corporation. But the court drew a distinction between such a case and sales of or subscription to the stock of an organized and going corporation. It said: "The necessities of the business of an organized company might demand an increase of capital stock, and if such stock is lawfully issued, it may very well be offered upon special terms. In such case, if the market price was less than par, it is clear that a purchaser or subscriber for such stock at its market value would, in the absence of fraud, be

liable only for his contract price.    So a case might arise where
the stock of a going concern was much depreciated, and where
its bonds were likewise below par, and there was lawful author-
ity to issue additional stock and bonds.    Now, in such case,
the real market value of an equal amount of stock and bonds
might not exceed, or even equal, the par value of either.    In
such cases, the question of fraud aside, a purchaser would only
be held for his contract price."    This case from Tennessee
puts as an illustration the exact case with which we are now
dealing.

The liability of a subscriber for the par value of increased
stock taken by him may depend somewhat upon the circum-
stances under which, and the purposes for which, such increase
was made.    If it be merely for the purpose of adding to the
original capital stock of the corporation, and enabling it to do
a larger and more profitable business, such subscriber would
stand practically upon the same basis as a subscriber to the
original capital.    But we think that an active corporation
may, for the purpose of paying its debts, and obtaining money
for the successful prosecution of its business, issue its stock and
dispose of it for the best price that can be obtained.    *Stein* v.
*Howard*, 65 California, 616.    As the company in this case found
it impossible to negotiate its bonds at par without the stock, and
as the stock was issued for the purpose of enhancing the value
of the bonds, and was taken by the subscribers to the bonds
at a price fairly representing the value of both stock and
bonds, we think the transaction should be sustained, and that
the defendants cannot be called upon to respond for the par
value of such stock, as if they had subscribed to the original
stock of the company.    Our conclusion upon this branch of
the case disposes of it as to those who were held liable by
virtue of their subscription to the bonds.

6.  We have no doubt the learned circuit judge held cor-
rectly that it was only subsequent creditors who were entitled
to enforce their claims against these stockholders, since it is
only they who could, by any legal presumption, have trusted
the company upon the faith of the increased stock.    *First
National Bank of Deadwood* v. *Gustin Minerva Consolidated*

*Mining Company,* 44 N. W. Rep. 198; 2 Morawetz on Corporations, §§ 832–3; *Coit* v. *N. C. Gold Amalgamating Co.,* 14 Fed. Rep. 12. We also agree with him, that creditors who became such after the increase was voted in May, 1886, are entitled to look to those who subsequently received the stock, notwithstanding they did not receive it until after the debts had been contracted. The circuit judge found in this connection that the "complainants had no knowledge or notice of the subscription paper of December 30, 1886, under which $45,000 of the new stock was distributed to those who subscribed for bonds, nor of the distribution among the old stockholders of $30,000 of said increased stock, nor does it affirmatively appear that they or either of them dealt with and trusted the company upon the faith of that increased stock; but the fact that the capital stock had been increased to $200,000 was made public and was generally known." The real question in this connection is — when may it be presumed creditors trusted the corporation upon the faith of the increased stock? Obviously, when such increase was ordered. That is a fact to which publicity would naturally be given; the creditors could not be expected to know when and by whom such stock would be taken. It is true they assume the risk of the stock not being taken at all, but the moment shares are taken, they are supposed to represent so much money put into the treasury as they are worth, which becomes available for the payment not only of future, but of existing creditors. It is manifest that any attempt to gauge the liability of stockholders by the exact time they took their stock with reference to the dates when the several claims of the creditors accrued, and by the further fact whether the creditors actually knew of and relied upon such stock, would, in a case like this, where the creditors and stockholders are both numerous, lead to inextricable confusion. Even the flexibility of a court of equity would be inadequate to adjust the rights of the parties.

7. With regard to the special defence set up by Neely, that he never consented to nor received certificates for increased stock, we agree with the circuit judge that it is not sustained. He did not live in Nashville, but had given a proxy to one

Sandford to represent him at stockholders' meetings; he knew of the arrangement to issue an amount of the stock equal to the bonds, and to distribute $30,000 of the increased stock, ordered by the resolution of May, 1886; and on April 5, 1887, he gave a power of attorney to Sandford, authorizing the latter, for him, and in his name and stead, to "receipt to the Clifton Coal Company for stock in my name, and transfer, bargain and sell the same as if I were there present." Under this power of attorney, Sandford surrendered Neely's certificate for 300 shares, and receipted for 375 shares, the certificates for which were delivered to him as agent of Neely, and which Sandford subsequently voted at stockholders' meetings, under the general proxy from Neely to represent his stock. Knowing of the contemplated action in issuing the new stock, and having authorized Sandford to represent him in all matters connected therewith, we think it too late for him to repudiate Sandford's act in receiving the additional 75 shares, which were distributed to him as the owner of 300 original shares. Indeed, the circuit judge finds it to be established by the proof that all of the old stockholders knew of and acquiesced in the disposition of the new stock as made; and that such increased stock was represented and voted at subsequent meetings of stockholders, and was recognized and held out to the public as part of the capital stock of the company. Under the case of *Sawyer* v. *Hoag*, 17 Wall. 610, Neely was clearly not entitled to set-off against the claim of the creditors his own claim against the corporation. Cook on Stock and Stockholders, secs. 193 and 194.

There are several minor points made in the briefs of counsel with regard to the claims of certain creditors, which we do not find it necessary to discuss at length. We think there was no error in the rulings of the court in these particulars.

It results that the decree of the court below must be

*Reserved, and the cause remanded for further proceedings in conformity with this opinion.*

Mr. Chief Justice Fuller, with whom concurred Mr. Justice Lamar, dissenting.

I dissent from the conclusion of the court in respect of the stock received by the subscribers to the bonds. That stock was not paid for in money or money's worth, or issued in payment of debts due from the company, or purchased at sale upon the market. It was a mere bonus, thrown in with the bonds as furnishing the inducement to the bond subscription, of larger control over the corporation, and of possible gain without expenditure. Becoming secured creditors through the bonds, the subscribers increased their power through the stock. In my view, there was no actual payment for the stock, and to treat it as paid up, is to sanction an arrangement to relieve those who would reap the benefit derived from the possession of the stock, in the event of the success, from liability for the consequences, in the event of the failure, of the enterprise.

When the capital stock of a corporation has become impaired, or the business in which it has engaged has proven so unremunerative as to call for a change, creditors at large may well demand that experiments at rehabilitation should not be conducted at their risk.

My brother LAMAR concurs with me in this dissent.