E. A. KINSEY ET AL. V. MT. AUBURN CABLE CO. ET AL.

1. SALE OF STOCK BY CORPORATION BELOW PAR NOT VALID IF DISCRIMINATING IN FAVOR OF CERTAIN STOCKHOLDERS.

The issuance and sale of stock by a corporation below par will not be permitted, if the transaction affords an opportunity for those having control of the corporate finances to obtain such stock on terms more favorable than those offered to other stockholders and to the general public.

2. CORPORATE STOCK MAY BE ISSUED BELOW PAR TO PRESERVE CORPORATE LIFE, BUT NOT TO FLOAT NEW OR DOUBTFUL ENTERPRISES.

A corporation may issue its stock at any price below par when such expedient is necessary to secure funds to preserve its corporate existence and to effect the purposes of its organization; but this doctrine must not be extended to the floatation and financing of corporations of doubtful stability and problematic success.

3. LEGALITY OF STOCK ISSUE BELOW PAR DEPENDS UPON BONA FIDE CHARACTER OF TRANSACTION.

The question of the legality of an issuance of stock by a corporation below par depends upon the good faith of those participating in the transaction in question.

APPEAL from Hamilton common pleas court.

**C. B. Matthews** and **Edward Strong,** for the appellants.

**Edward Colston,** for the appellees.

## JELKE, J.

The Mt. Auburn Cable Company was incorporated under the laws of the state of Ohio, with a capital stock of $100,000. The purpose of this incorporation was to build a street railroad from Fourth street in Cincinnati through a portion of Mt. Auburn to Avondale. The construction of the road was begun in 1887, and completed for operation in June, 1888. On March 5, 1887, the capital stock of the company was increased to $300,000; of this $300,000, $174,000 was subscribed and paid for, so that in September, 1887, there was unissued in the treasury of the company $126,000 of this capital stock. At that time there was on hand a considerable quantity of machinery and material for the construction and equipment of the road; but the road became embarrassed for want of sufficient funds for its completion. There were outstanding at that time promissory notes and acceptances to Messrs. Henry Martin, David Sinton, Rudolph Wurlitzer, Marcus Warth, and other stockholders and directors of the company, to the amount of about $77,000. In addition there were Henry Martin's acceptances of $19,000. There were

other obligation—on contracts for material and equipment—bringing the total obligations on or about October 18, 1887, to the sum of $152,-731.44.

It appears that the holders of some of these claims were pressing for payment, and that in addition to the necessary liquidation of these outstanding claims some further money was needed to complete the road ready for operation.

It appears that after the transaction herein involved was consummated that there was actually raised the sum of $27,868.56 in addition to the funds used for the liquidation of the liabilities aforesaid.

It appears in evidence that the representatives of the Mt. Auburn Cable Railway Company had made strenuous efforts to sell the bonds and treasury stock of the company, but whatever their efforts may have been, or at whatever terms they had offered these securities to the general public, they had been unsuccessful.

It appears that the bonds of the company had, at times, in one or two sales, sold as low as eighty cents on the dollar; but for the most part they had brought par at all times, and were finally assumed by the Cincinnati Street Railway Company, and have at all times since then brought a substantial premium.

In September, 1887, the Cincinnati Traction & Construction Company was incorporated with a capital of $5,000, of which only 10 per cent was subscribed, and it does not appear how much, if any, of the sum subscribed was ever actually paid.

About this time the following arrangement was devised and entered into:

"Cincinnati, O., October 13, 1887.

"We, the undersigned, agree to purchase from the Cincinnati Traction & Construction Company, 180 first mortgage bonds of the Mount Auburn Cable Railway Company, and 1,250 shares of stock of said company—par value of $100. Each of the undersigned to pay the sums of money set opposite our respective names for the purpose of making said purchase. Said money to be paid to the treasurer of the Cincinnati Traction & Construction Company, payments to be made as follows: The notes of the Mount Auburn Cable Railway Company, held by any of us to be taken at their face value without interest, on account of said subscription and 33 1-3 per cent of the balance cash on completion of this paper, 33 1-3 per cent in thirty days thereafter and 33 1-3 per cent in sixty days thereafter. We to take respectively and in our proper proportions for the amounts hereto subscribed by us, the 180 first mortgage bonds and 1,250 shares of stock aforesaid. A condition of this pur-

Kinsey v. Cable Co.

chase that the December, 1887, coupons are not to be presented for payment prior to January 1, 1888. This agreement not to be binding unless $180,000 is subscribed:

| | |
|---|---:|
| David Sinton ................................................ | $ 23,000 00 |
| Henry Martin ............................................. | 66,000 00 |
| Elijah Coombe ............................................ | 8,000 00 |
| Rudolph Wurlitzer ....................................... | 11,500 00 |
| James M. Potter ......................................... | 4,500 00 |
| Marcus Warth ........................................... | 12,500 00 |
| Wm. F. Irwin ............................................ | 1,500 00 |
| H. H. Coombe ............................................ | 1,000 00 |
| Alb. Erkenbrecher ....................................... | 11,500 00 |
| A. E. Burkhardt ......................................... | 5,000 00 |
| George Gerke ............................................ | 2,000 00 |
| William Means .......................................... | 2,000 00 |
| John R. DeCamp ......................................... | 2,000 00 |
| Edward N. Roth ......................................... | 2,000 00 |
| J. A. S. Gray ............................................ | 8,000 00 |
| F. M. Joyce ............................................. | 1,000 00 |
| Samuel W. Ramp, Agent ................................. | 2,000 00 |
| G. K. Duckworth ........................................ | 2,000 00 |
| John B. Deiters ......................................... | 1,000 00 |
| Broderick & Bascom Rope Co., Jos. W. Wayne, ............ | 5,000 00 |
| Louis Van Antwerp, per J. H. M., ...................... | 5,000 00 |
| Total ................................................ | $180,000 00 |

"Completed October 17, 1887.

"JOHN H. MARTIN."

Thereupon the following contract was entered into:

"October 18, 1887.

"1.   Mount Auburn Cable Railway Company.

"2.   Cincinnati Traction & Construction Company.

"1,250 shares stock of $100 each.

"180 first mortgage bonds, December, 1897, coupons attached.

"Party of the first part to correspond with contractors, etc., to receive all materials and issue its acceptance therefor.

"Second party to meet all acceptances as they mature, and hold first party free and harmless from any and all damages or expense by reason thereof.

Hamilton County.

"Party of second part agrees to assume the full obligations; to complete the unexecuted and partially executed contracts herein mentioned, and perform the labor specified:

"1. To complete the eight miles single track cable railway between southern terminus of Fourth and Sycamore, and the northern terminus of Rockdale and Main avenues, using material of Mount Auburn Cable Railway Company on hand and unused, free of expense to said second party doing said work, in a good and workmanlike manner similar to the construction already begun by the first party and to its entire satisfaction restoring the streets to as good a condition as before being opened.

"2. To complete the contract between first party and Lane & Bodley.

"3. To assume the existing contract between first party and Brill Car Company for six grips and six coaches.

"4. To assume balance due on contract with L. Schreiber Sons for street vault at power house.

"5. To assume the cash payment when due on the contract between first party and Broderick & Bascom Company.

"8. To furnish six grips and attachments complete as per plans and specifications at an expense not to exceed $2,500.

"7. To assume and pay all outstanding acceptances as of date fifteenth of September, 1887, reimbursing Henry Martin for all of same taken by him since that—total amount of same being $19,000.

"8. To furnish six grips and attachments complete as per plans and specifications of first party.

"9. To pay all expenses of draughting, pattern making, office rent, etc., not to exceed $1,000.

"10. To complete all boulder pavement repairs required, not to exceed $200.

"11. To assume and pay the promissory notes of the Mount Auburn Cable Railway Company, amounting to $77,000, which were executed to certain stockholders of said company, returned the collateral security attached to them to the first party.

"(Signed)       THE MOUNT AUBURN CABLE RAILWAY CO.,
                        "HENRY MARTIN, President,
                        "WM. T. IRWIN, Secretary.

"October 18, 1887.
"(Signed)       THE CINCINNATI T. & C. CO.,
                        "SAM W. RAMP, Treasurer."

After this arrangement was consummated, the road was finished and put in operation.   It does not appear that the Cincinnati Traction & Construction Company ever actually did anything.   There was no change in the persons directing and managing the completion and construction of the road, and that the same people and the same policy prevailed.   The fact of the matter was and we do find, that the Cincinnati Traction & Construction Company was a mere fiction, and served no substantial purpose in effecting the things that were herein done.   In fact, its presence and the part which it played, became almost a badge of fraud and created the gravest doubt and suspicion as to the good faith of those lending themselves to this arrangement.   Page 89 of Journal No. 2, shows an entry made by Arch Irwin, the bookkeeper of the company, and a son of William F. Irwin, a director of the company and its secretary, which entry was dated October 1, 1889, made as follows:

"CONSTRUCTION AC.

"TO CINCINNATI TRACTION & CONSTRUCTION CO., DR.

"To amount of stock issued to purchasers of first mortgage bonds, as a bonus for purchasing them at par, $126,000."

There is some dispute as to the authorization of this entry, but it seems to have been made in the usual course of business, and so far as the testimony shows, it seems to be in accord with the understanding of all parties interested and as a necessary and only way of balancing the funds of the company.   The verity of this entry was never challenged until the construction of the transaction became important in determining the issue herein involved.

After the road was in operation, there were a second and third issue of mortgage bonds, so that finally there were outstanding $180,000 first mortgage bonds, $22,000 second mortgage bonds and $137,000 third mortgage bonds.   Nearly all of these bonds were issued to and held by the same persons who had acquired $180,000 first mortgage bonds and the $126,000 stock under the agreement aforesaid.   In fact, nearly all the money at any time put up or invested in this enterprise, was put up and invested by those who had originally gone into the enterprise and had had faith in it, and who after they had made a considerable investment had of necessity to put in more to sustain the enterprise and secure their earlier investment.

The burden of carrying this enterprise seems at all times to have been about where it belonged.

In 1893 a receiver was appointed by the court of common pleas of

Hamilton County.

Hamilton county, Ohio, in an action to foreclose the third mortgage bonds of the cable company.

In 1895 the receiver sold the road and its property under order of the court for $350,000 to David Sinton, trustee for bondholders; in 1896 said David Sinton sold it to the Cincinnati Street Railway Company for $400,000, the first mortgage bond issue, $200,000, and the second mortgage bonds outstanding, $20,000, being assumed as part thereof. In addition to the mortgage bonds, the referee found that there were unsecured debts amounting to $126,904.04, of which the following amounts were claimed by persons who subscribed and were parties to the agreement of October 18, 1887, aforesaid. Finally, on the report of the referee, the common pleas court made an assessment of .4975 per cent on the stockholders, as follows:

| | |
|---|---:|
| Elijah Coombe, 10 shares .............................$ | 497 50 |
| H. H. Coombe, 10 shares ............................... | 497 50 |
| Chas. Cowie, 10 shares ............................... | 497 50 |
| Jno. B. Dieters, 17 shares ............................ | 845 75 |
| Jas. A. S. Gray, 25 shares ........................... | 1,243 75 |
| Cath. N. Hauck, Extrix., 50 shares ...................... | 2,487 50 |
| Alfred Hill, 110 shares ............................... | 5,472 50 |
| Jacob Menderson, 25 shares ........................... | 1,243 75 |
| Henry Martin, 793 shares ............................. | 39,452 50 |
| Neva W. Martin, Trust., 1 share ........................ | 49 75 |
| Jas. M. Potter, 38 shares ............................. | 1,890 50 |
| Lou. M. Porter, Extrx., 5 shares ....................... | 248 75 |
| Chas. E. Page, 10 shares ............................. | 497 50 |
| David Sinton, 277 shares ............................. | 13,781 00 |
| Hy. P. Smith, 50 shares ............................... | 2,487 50 |
| Lewis Seasongood, 180 shares .......................... | 8,955 00 |
| Theo. Sengstak, 170 shares ........................... | 8,457 50 |
| Eleanor Tatum, 10 shares ............................. | 497 50 |
| Fred Vogeler, 50 shares .............................. | 2,487 50 |
| Marcus Warth, 232 shares ............................. | 11,542 00 |
| Rudolph Wurlitzer, 255 shares ........................ | 12,686 25 |
| Jno. W. Wayne, 34 shares ............................. | 1,691 50 |

Total shares, 2,362.    Total ......................$117,510 50

And entered up several judgments against such stockholders accordingly. To this entry Lewis Seasongood prosecuted his separate appeal to this court, his contention being that as against the claim of David Sinton,

Joseph Wayne and others, aggregating $84,903.71, should be set off, their liability in that amount to contribute to the funds of the corporation on account of the $126,000 of its capital stock for which they paid nothing, and which they received as a bonus for taking its first mortgage bonds.

Two questions are thus here presented:

First, one of fact, whether the subscription of this $126,000 of capital stock and the consideration therefor are so interwoven with the sale and issue of the $180,000 of bonds that it can not be ascertained what separable price, if any, was paid for the stock, and so that it can not be said that nothing was paid for the stock; and

Second, a mixed question of law and fact, whether this $126,000 of capital stock was subscribed and issued under circumstances justifying in law its being given by the corporation as a bonus or being sold by the corporation at a price far below its face or par value.

On the first issue of fact we find that said stock was given by the corporation as a "bonus" in the sale of the bonds, and whether they were issued for absolutely nothing or for a consideration, the consideration, if any, was so small and insignificant to make as the same legal inquiry pertinent and the same principles of law applicable.

On the second question as to the circumstances under which a corporation may lawfully issue its capital stock as fully paid up at a price much below par, we are guided by a consideration of the following cases:

*Fogg* v. *Blair*, 139 U. S. 118 [11 Sup. Ct. Rep. 476; 35 L. Ed. 104]:

"It is the settled doctrine of this court, as well as of the supreme court of Missouri, that unpaid subscriptions to the stock of a corporation constitute a trust fund for the benefit of creditors, which may not be given away or disposed of by it, without consideration or fraudulently, to the prejudice of such creditors.   *   *   *

"While it was competent for a railroad corporation in Missouri, exercising good faith, to use its bonds and stock in payment for the construction of its road, it could not rightfully, at least as against creditors or stockholders, issue its stock to contractors as full paid, without getting some fair or reasonable equivalent for it.  What was such an equivalent depends primarily upon the actual value of the stock at the time it was contracted to be issued, and upon the compensation which, under all the circumstances, the contractors were equitably entitled to receive for the particular work undertaken or done by them.   *   *   *   the corporation, by its directors, could sell or dispose of its assets to the prejudice of creditors and stockholders under such circumstances, on such terms and at such prices as indicated, upon the face

of the transaction, that they were being squandered recklessly or fraudulently in disregard of the trust committed to them.

*Clark* v. *Bever*, 139 U. S. 96, 97 [11 Sup. Ct. Rep. 468; 35 L. Ed. 88]:

"That whether a stockholder in law or in fact, owed to the corporation any sum on the stock held by him, was left by the statute to be determined in each case, upon its own circumstances, and in accordance with the principles of general law touching the rights and liabilities of creditors and stockholders.

"While the capital stock of a corporation, especially its unpaid subscriptions, is a trust fund *sub modo* for the benefit of its general creditors, a corporation—no statute forbidding—may in good faith sell or dispose of its stock to creditors in discharge of their debts

"The principle reaffirmed that when the interest of the public or of a stranger is to be affected by any transaction between the stockholders owning a corporation, and the corporation itself, such transaction is subject to rigid scrutiny, and if found to be infected with anything unfair towards such third person, calculated to injure him, or designed intentionally and inequitably to screen the stockholder from loss at the expense of the general creditor, it will be disregarded or annulled so far as it inequitably affects him. Therefore, when the interest of creditors requires, those holding shares in a corporation, purporting to be, but which are shown not to have been, paid for to the extent of their face value, should be held liable to pay for such shares unless it appears that they acquired the stock under circumstances that did not give creditors and other stockholders just ground for complaint."

*Handley* v. *Stutz*, 139 U. S. 417 [11 Sup. Ct. Rep. 530; 35 L. Ed. 227]:

"When a stockholder in a corporation who assents to an increase in the capital stock of the corporation and its gratuitous distribution among the shareholders, receives such stock as full paid stock, an obligation arises to pay for it in full, when called upon to do so by creditors whose debts are subsequent to the authorization of the increase; but this equity does not exist in favor of a creditor, whose debt was contracted prior to such authorization.

"An active corporation, finding its original capital impaired by loss or misfortune, may, for the purpose of recuperating itself, and of producing new conditions for the successful prosecution of its business, issue new stock and put it upon the market, and sell it for the best price that can be obtained; and in such case no such trust in favor of a creditor arises against the purchaser who, in *good faith,* buys for less than par."

*Camden* v. *Stuart,* 144 U. S. 104 [12 Sup. Ct. Rep. 585; 36 L. Ed. 363]:

"The trust arising in favor of creditors by subscriptions to the stock of a corporation can not be defeated by a stimulated payment of such subscription, nor by any device short of an actual payment in good faith; and it was not intended by anything said in *Clark* v. *Bever,* 139 U. S. 96; *Fogg* v. *Blair,* 139 U. S. 118, or *Handley* v. *Stutz,* 139 U. S. 417, to overrule this principle, or qualify it in any way, but only to draw a line beyond which the court was unwilling to go in affixing a liability upon those who had purchased stock of the corporation, or had taken it in good faith in satisfaction of their demands.

"Applying this rule to the testimony and mass of figures in this case, the court affirms the judgments of the court below against stockholders in these cases, whose subscriptions for their stock in the corporation, defendant in error in No. 643, were shown to be in part unpaid."

*Rickerson Roller-Mill Co.* v. *Foundry & Machine Co.* 75 Fed. Rep. 554 [23 C. C. A. 302; 43 U. S. App. 452]:

"1. Corporations — Issue of Stock — Sale Below Par.—When a corporation, not for the purpose of restoring its capital, impaired by losses in business, but for the purpose of providing new capital to carry on or extend its business, issues and sells stock at less than its par value, the purchasers of such stock take the same subject to the contingency that, in the event of the insolvency of the corporation, they would be liable to creditors, who had become such in ignorance of the terms of their purchase, for the difference between the price actually paid for the stock and its par value. *Handley* v. *Stutz,* 11 Sup. Ct. Rep. 530; 139 U. S. 417, distinguished.

"2. Same—Rights of Creditors.—In the absence of statutory or charter provisions, however, a corporation may agree with a subscriber to its stock to receive less than the par value therefor; and a creditor of the corporation, who becomes such with knowledge of such an agreement between the corporation and the subscriber, cannot require the subscriber, upon the insolvency of the corporation, to pay his stock in full."

*Peter* v. *Manufacturing Co.* 56 Ohio St. 181 [46 N. E. Rep. 894]:

"The directors and managing officers of a corporation for profit should be held to strict good faith in all dealings between themselves and the corporation. Where, however, the corporation is deeply in debt and pressed for money to continue its business; where a large proportion

of its capital stock remains unsubscribed, a great part of which was created by an unauthorized increase of the same, for which such directors and managing officers were chiefly responsible, though acting in good faith and in the belief that their action was regular; where such directors and managing officers believe the only practicable means of obtaining money to relieve the necessities of the corporation is by disposing of this stock; where accordingly they make diligent but unsuccessful efforts to dispose of the stock at par; where they offer it at a large discount to all its stockholders and generally to others without takers, such directors and managing officers and some others without intending to secure personal advantage, but with a view to aid the corporation, take parts of the stock at the discount price, either paying cash therefor, or cancelling debts due to them from the corporation, and they do not afterwards derive any profit on account of such stock, bad faith should not be imputed to them, either in respect to such increase of capital stock or their acquisition of it."

All of these cases have been digested and considered by Clark & Marshall on Corporations, who sum them up with the following comment:

"Sections 1246-1247. Fraud is the Only True Basis of this Doctrine.—Some of the courts, including the Supreme Court of the United States, in its earlier opinion, have based this doctrine upon the ground that the subscribed capital stock of a corporation is in equity a trust fund for the payment of its debts, and that no agreement between a corporation and its stockholders can affect the right of creditors to so treat it. It is now practically settled, however, that this is not the basis of the doctrine, for neither the unpaid subscriptions of a corporation nor its other assets are in any proper sense a trust fund for creditors. The true and only ground of the doctrine is fraud. Any arrangement between the stockholders of a corporation and the corporation, by which the former are to pay nothing at all, or less than par, either in money or property, for shares of stock which are issued and represented to the public as being full-paid, is clearly a fraud upon persons who deal with the corporation on the faith of such representation, and it requires the application of no new principle to enable a court of equity to prevent creditors from being defrauded by compelling the stockholders to make their representation good. Creditors not defrauded can not complain."

Clark & Marshall, Priv. Corp. ("Watered Stock"), page 1242:

"400. Issue to Directors or Other Officers.—The rule that the directors and managing officers of a corporation are to be held to strict good faith in all dealings between themselves and the corporation ap-

Kinsey v. Cable Co.

plies as well when they issue stock to themselves as in other cases. If they act in bad faith and obtain a profit or advantage not enjoyed by other stockholders, they may be called to account, or the transaction may be set aside.

"They may purchase stock, however, if they act in good faith, and they will incur no liability to the corporation or the other stockholders, in the absence of a statute, even when they purchase stock at less than par, where it appears that they acted in good faith and in the interest of the company, particularly where they have obtained no profit or advantage for themselves from the transaction. In a late Ohio case, in which stockholders of a corporation who had paid par for their stock sought to hold the directors and managing officers and others liable upon stock taken by them at less than par for the difference between what they paid and the par value, it appeared that the corporation at the time, and before the stock was taken, was deeply in debt, and pressed for money to continue its business; that a large part of its capital stock remained unsubscribed, a great part of which was created by an unauthorized increase of the same, for which the directors and managing officers were chiefly responsible, though acting in good faith, and in the belief that their action was regular; that the directors and managing officers believing that the only practical means of obtaining money to relieve the necessities of the corporation was by disposing of this stock, and after having made diligent but unsuccessful efforts to dispose of it at par, offered it at a large discount to all of its stockholders, and generally to others, without intending to secure any personal advantage, but with a view to aid the corporation, took parts of the stock at the discount price, either paying cash therefor, or cancelling debts due to them from the corporation, but did not then or afterwards derive any benefit on account of the stock. Under these circumstances it was held that bad faith was not imputable to them with respect either to such increase of the stock or their acquisition of it; that, on the corporation becoming insolvent, the difference between the discount price and the par value of the stock thus purchased should not be regarded as assets of the corporation, as between those who bought at a discount and those who did not; and that the holders of previously issued stock, for which they had paid par, should not be allowed to assert the invalidity of the issue of the discounted stock without consenting that its purchasers be placed in *statu quo.*"

Clark & Marshall, "Priv. Corp." ("Watered Stock") page 1250:

"(b) Issue of Stock for Cash at a Discount.—The doctrine that the issue of watered or fictitiously paid up stock is a fraud upon per-

sons who become creditors of the corporation in reliance upon its capital stock clearly applies when the original stock of a corporation is issued for cash as paid-up, under an agreement that payment in full shall not be required. Even in the absence of express statutory or constitutional provisions, as well as where there are such provisions, a court of equity, or other court having jurisdiction of winding up proceedings, will disregard the agreement and enforce full payment for the stock so far as may be necessary to satisfy the claims of the creditors of the corporation who have dealt with it in reliance on the stock being full paid; and by statute in some jurisdictions a creditor may proceed at law.

"When stock is issued to subscribers for less than its par value in cash, the right of creditors to compel full payment can not be defeated by showing that there was no actual fraudulent intent in the transaction.

"(c) Issue of Stock as a Gratuity.—In a New York case, where a corporation had issued paid-up stock as a gratuity, it was held that a judgment creditor of the corporation, on its becoming insolvent, could not maintain a suit in equity to compel the stockholder to pay for the stock contrary to his agreement with the corporation. 'The liability of a shareholder to pay for his stock,' said the court, 'does not arise out of his relation, but depends upon his contract, express or implied, or upon some statute, and in the absence of either of these grounds of liability, we do not perceive how a person to whom shares have been issued as a gratuity has, by accepting them, committed any wrong upon creditors, or made himself liable to pay the nominal face of the shares as upon a subscription or contract.' It does not appear, from the report of this case, whether the creditor was such after it was issued, and in reliance on its being in fact full-paid. If the former, then the decision is clearly a sound one, but if the latter, it is contrary to the prevailing rule.

"As we have seen, it is the ground of fraud, and not on the ground of contract, that persons to whom stock has been issued as full-paid, when it is not so in fact, are held liable to creditors, and the reason for the doctrine, therefore applies as well where the stock is issued as a gratuity as where it is issued for cash at a discount. In the former case, the holder does not agree to pay anything; in the latter he does not agree to pay anything further than what he has paid. It has repeatedly been held, therefore, that if a corporation issues its stock as full-paid without receiving any consideration, and particularly when it does so in violation of an express charter, statutory or constitutional

Kinsey v. Cable Co.

provision, and the stock is falsely held out to the public as being full-paid, the transaction, even when binding upon the corporation and consenting stockholders, operates as a fraud upon persons who subsequently deal with the corporation and become creditors on the faith of its capital stock being full-paid, and a court of equity, or, in some jurisdictions, by statute, a court of law, will compel full payment for the stock, if necessary for the satisfaction of their claims.''

It appears from an examination of these authorities that the whole question turns upon a question of the good faith of those participating in the transaction, and in this connection it is to be noted that those who put through this transaction and got whatever of benefit supposedly there might have been in it, were those that were the directors, dominant stockholders and the leaders in control of the affairs of the corporation, and they are those who are held to the strictest accountability and whose conduct is subject to the closest scrutiny as against the rights of everybody whose interests were directly or indirectly in their custody. It is said that if objection on this account could be made it could only be made by subsequent creditors and not by stockholders—the situation of Mr. Seasongood. But this defense on the part of Mr. Seasongood is not sought to be interposed as against the creditors other than those making up the $84,903.71 of claims, who are interested in not urging this claim against themselves on their unpaid subscription. It is not reasonable to suppose that they would urge this claim to their own detriment and hence the right to urge the same must pass to and be asserted by those who would be interested and benefited if the claim prevails.

In examining the good faith of the transaction of October, 1887, one is impressed by the small amount of cash the company received in addition to its indebtedness already outstanding; and for all of which these parties were directly or indirectly under the burden, that is, by holding the notes or acceptances of the company, or were liable on the statutory stock liability for its general indebtedness; in comparison with the vast amount of securities of the company issued, to wit, $180,000 first mortgage bonds and $126,000 of its capital stock.

These parties parted with so little new money.

They safeguarded themselves for all the money actually invested by taking bonds secured by mortgage on all the property bought by their money so furnished to the corporation and then sought to speculate on the future earning capacity of the enterprise on terms more favorable than the other shareholders had received and more favorable than they would have been willing to accord to the public.

Hamilton County.

Again, while it appears that efforts had been made to sell the stock and bonds of this company at home and abroad in the general market, and that these efforts had been thwarted probably by the malicious intervention of rivals, yet there was nothing in this that ought not to have been anticipated by those who originally subscribed for the stock, and who were certainly familiar with all the conditions surrounding this enterprise. The record does not show that the arrangement which was finally entered into was ever offered in the general market or to the public, and it is extremely doubtful whether those who finally entered into this arrangement would have consented that outsiders should have subscribed and taken this stock and these bonds on any such terms.

It is urged by counsel for Mr. Seasongood, that the cases of *Peter* v. *Manufacturing Co.* and *Handley* v. *Stutz, supra,* are not applicable because the Mount Auburn Cable Railway Company was not a going or active corporation at the time of this transaction.

An examination of the cases and a comparison of the cases of *Fogg* v. *Blair* and *Rickerson Roller-Mill Co.* v. *Foundry & Machine Co., supra,* show that this is an element entitled to great weight in consideration, but is not altogether determinative, but it is indeed an element to be considered in ascertaining whether such a crisis was present which could not or ought not to have been foreseen and anticipated as a natural burden upon those already having invested in the enterprise, as to justify this transaction as a means to save its life.

We understand that the corporation is justified in issuing its stock at any price it can obtain for the purpose of securing funds to preserve its corporate life and to prosecute the business and ends of an active corporation, but we do not understand that this expedient is to be resorted to to assist in the birth of financial cripples.

Not to hold resort to such extreme expedients within strictest limit and closest scrutiny would open floodgates to a deluge of stock-watering in the creation and flotation of ill-conceived enterprises.

It would pave the way for the old desire for a chance at the profits, at the same time securing the investment from the hazard of loss.

We do not mean to say that the gentlemen who participated in this transaction were conscious of committing fraud in a sense involving moral turpitude, but that they were astute in taking care of themselves without a sufficient regard to the rights and future liabilities of others to a degree not tolerated by a court of equity.

It is claimed that there should be restitution by Henry Martin of $16,000, which seems to have been showered upon him almost against

Kinsey v. Cable Co.

his protest. It may be that Henry Martin had performed services, but if he had voluntarily made the corporation a present of this service, and wanted no compensation therefor and made no claim, the money so paid to him was substantially a present and at no time was this company or its directors (of whom Henry Martin was one) in a position to be generous at the expense of its creditors, or shareholders innocently suffering through them. Further, there are claims on the assessments against John J. Broderick, James D. Bascom, Isador Blumenthal, James W. Frost, R. W. Healy, Fred Koettler and William Means, aggregating in all 169 shares, which have never been properly or duly prosecuted. The conclusion we have reached on the unpaid stock subscriptions is sufficient to relieve appellant from assessment; we are, therefore, of opinion that such appellant is entitled to a decree discharging him from liability.

**Swing, J.,** concurs.

**Giffen, J.,** dissents from the finding and judgment.