## WILLIAM E. HEBBERD et al.

### v.

## THE SOUTHWESTERN LAND AND CATTLE COMPANY.

1. A mortgage made by a New Jersey corporation upon personal property
in the Indian territory, which was neither filed nor recorded in any public
office in this state or elsewhere pursuant to statute, and under which pos-
session of the mortgaged property was not taken by the mortgagees, is without
validity as to creditors of the corporation who, upon the appointment of a
receiver, because of the insolvency of the corporation, and the receiver's
taking possession of the property, had their claims fastened upon the
property.

2. Capital stock of a corporation, issued for property not worth five per
cent. of the par value of the stock, in pursuance of a scheme designed to
secure the issue of the stock as fully paid without value having been received
by the corporation for it, is not fully-paid stock in the hands of those who
were cognizant of or parties to the scheme and its execution.

3. The bonds of such corporation, issued pursuant to a further fraudulent
scheme to put such bonds in circulation without value having been paid for
them, having the qualities of commercial paper in the hands of innocent
holders for value before maturity, are valid obligations of the company to the
extent of the value paid for them.

Hebberd *v.* Southwestern Land and Cattle Co.

4. Where purchasers of bonds of a corporation which has become insolvent and has been so adjudged and is being accordingly dealt with under the statute, have received shares of capital stock as a bonus, for which they have not paid anything, they will not be paid a dividend upon their bonds until it shall be ascertained whether they will be subject to calls by reason of their stock, and they shall have responded to calls made, to the end that there may be offset against the dividends.

5. D., the president of the S. W. L. & C. Co., drew a note for $10,000, to his individual order, signing it with the name of the company, by himself as its president, and endorsed it and presented it for discount at a bank. With it he presented to the bank a statement, signed by one H., who was represented to be " in charge" of the company, which exhibited that the company was indebted to D. in a larger sum than the amount of the note. The bank discounted the note and passed the proceeds to the individual credit of D.—*Held*, that the note was a valid claim, in the hands of the bank, against the company, though in fact it owed D. only $55, the bank having taken the note in good faith and before maturity.

6. D. used the proceeds of the note to buy cattle, which he put upon the cattle range belonging to the company.—*Held*, that a trust was impressed on the cattle in favor of the company.

7. The receiver of the company took actual possession of the cattle and sold them.—*Held*, that his right to the proceeds of sale is superior to the claim of a mortgagee of the cattle who never was in possession of them.

On petition by the receiver of the defendant company for instruction &c.

*Mr. William C. Spencer,* for the receiver.

*Mr. Charles B. Meyer* (of New York), for William Keating Clare, William Clark, George A. Clark & Brother, William W. Andrews, administrator of the estate of J. W. Canfield, and Carrie M. Damon, executrix of the will of George A. Damon, deceased.

*Mr. Herbert J. Haff* (of Missouri), for the German-American National Bank of Kansas City.

*Mr. John H. Clapp* (of New York), for George F. Moore and himself, as executor of the will of George A. Damon, deceased.

*Mr. Charles C. Leeds* (of New York), for C. C. Leeds and W. M. Murray, trustees, himself as a creditor of the Southwestern Land and Cattle Company, and William W. Hebberd.

THE CHANCELLOR.

The receiver of the Southwestern Land and Cattle Company, an insolvent corporation of this state, appointed by the court of chancery, by his petition asks to be instructed what disposition he shall make of the proceeds of the sale of certain cattle to which particular reference will hereafter be made, and as to the validity and *status* of certain claims which have been presented to him. All persons interested in the desired instruction, upon the presentation of the petition, appeared by their respective counsel, and, in pursuance of their written assent, it was ordered that evidence be taken upon the issues suggested, and upon the coming in of the evidence the several parties were heard.

The Southwestern Land and Cattle Company was incorporated on the 15th day of February, 1884, by certificate under the General Corporation law of this state, approved April 7th, 1875, and its supplements. The object for which it was formed, as indicated by its name, was, in substance, to deal in lands and cattle and their products. Its capital stock was fixed at $500,000, divided into twenty-five thousand shares of the par value of $20 each. The certificate stated that the company would commence business with $500,000; that the stockholders were George F. Damon, Henry A. Dickinson, Effingham H. Warner, John T. Dutcher and William T. Mersereau, each of whom held five thousand shares, and that the company would continue fifty years. It was signed by each of the stockholders named.

It appears that stock certificates for five thousand shares each, marked in the margin "for property purchased," were issued to the several corporators, but that cash was paid by the stock subscribers for only five shares each, and that subsequently the five-thousand-share certificates were returned to the company, and in their place certificates for five shares to each were issued, leaving untransferred twenty-four thousand nine hundred and seventy-five shares. This transaction is styled, on the journal of the corporation, "a contribution" of twenty-four thousand nine hundred and fifty shares, "to enable the Southwestern Land

and Cattle Company to carry out its contract for the purchase
of the assets of the New York Cattle Company."

Later, on the 1st day of March, 1884, an agreement fabricated
by Damon was entered into between the Southwestern Land and
Cattle Company and the New York Cattle Company (Limited),
a corporation of the State of New York, in both of which com-
panies Damon was a. stockholder and active manager, whereby
the latter company agreed to sell and assign to the former a lease
for five years from October 1st, 1883, of a cattle range in the
Indian territory, which it had obtained from the Cherokee Strip
Live Stock Association, and also cattle, horses, mules and the
range equipment, for $499,500, to be paid by the transfer and
delivery to it of twenty-four thousand nine hundred and seventy-
five shares of the capital stock of the Southwestern Land and
Cattle Company, and the assumption of the payment of a note
for $29,000, which the vendor had given to a third party.

The agreement recites that it was the intention of the South-
western Land and Cattle Company to issue a mortgage upon
the property so to be acquired, for $500,000, to secure the pay-
ment of bonds, and that when the mortgage should be executed
the Southwestern Land and Cattle Company would exchange
$142,000 of the bonds for eleven thousand seven hundred and
twenty-five shares of the capital stock held by the vendor. Pend-
ing the exchange of the eleven thousand seven hundred and
twenty-five shares of stock, the stock was to remain in the
possession of a trustee.

Subsequently a mortgage of even date with the agreement of
sale was executed. It purported to mortgage all the assets,
present and future, of the Southwestern Land and Cattle Com-
pany to secure bonds aggregating in amount $500,000 and pay-
able in ten years, the privilege being reserved to the company to
pay any bond with a premium of five per cent. at an earlier date.

The mortgage was made to Charles C. Leeds, then the legal
adviser of the Southwestern Land and Cattle Company, and
William M. Murray, a stockholder in the New York Cattle
Company (Limited), as trustees. It was never either filed or
recorded in any public office in this state, New York state,

the Indian territory, or elsewhere. Nor was possession of any property delivered or taken in virtue of it. As to creditors obtaining a lien, it is without validity. *Rev. p. 709 § 39; Jones Chat. Mort. § 176; Currie* v. *Knight, 7 Stew. Eq. 485, 486.* The claims of creditors fastened upon the property of the insolvent company upon the appointment of the receiver. *Graham Button Co.* v. *Spielman, 5 Dick. Ch. Rep. 120.*

Of the bonds, $184,500 in face value were issued, and of that amount, $142,000, together with thirteen thousand two hundred and fifty-five shares of capital stock, of the par value of $264,500, went to the New York Cattle Company (Limited), and were divided among its stockholders.

The property thus sold by the New York Cattle Company (Limited) to the Southwestern Land and Cattle Company, with the exception of some cattle bought of one Creswell by the note of $29,000, which the Southwestern Land and Cattle Company subsequently paid, was substantially the same property which the New York Cattle Company (Limited) had previously, in April, 1883, bought, through one Sandford, from a corporation called the Jackson Cattle Company (Limited), of Goshen, for the stated consideration of $25,000. An examination of the books and papers of the several owners of these assets reveals a progressive inflation of the valuation of them as they passed from owner to owner to the enormous sum of $499,500. The assets thus purchased are entered and valued in the books of the Southwestern Land and Cattle Company in an inventory in this form :

| | | |
|---|---|---|
| 1. Lease and good will of New York Cattle Company... | $100,000 | |
| 2. Cattle account | 175,000 | |
| 3. Horse and mule account | 10,000 | |
| 4. Supply account | 5,000 | |
| 5. Fixtures and outfit | 9,500 | |
| 6. Franchise | 200,000 | |
| | $499,500 | |

What the real value of the assets purchased was is not shown by determinative proofs, but the strong indications are that it did not exceed one-twentieth part of $499,500.

William E. Hebberd, who appears to have been the sole clerk or factotum of the company's principal office in New York city, testifies that the last item of the statement or inventory, "Franchise, $200,000," was a fiction of his inventory to force the valuation to the desired $499,500, and also that the first item of the inventory, "$100,000 for the lease and good will," was made in face of the fact that the New York Cattle Company had been operated at a loss. He further testifies that George F. Damon, the leading spirit of the fabrication and the president of the company, some time after the organization, declared that the valuation should not have been put higher than $150,000; that it was a mistake to put it so high as half a million.

I think that it abundantly appears that the transaction by which the stock was issued for property purchased was not an honest one, at least so far as Damon was concerned, and that, in his hands at least, the stock cannot be considered as fully paid.

As one of the stockholders of the New York Cattle Company (Limited), among whom the shares and bonds of the Southwestern Land and Cattle Company delivered to that company were divided, Mr. Damon took nine thousand seven hundred and seventy-one shares of stock and $24,500 in bonds. Upon paying the company $10 a share, half par value, he caused six hundred additional shares of the capital stock to be transferred to himself. He also purchased $12,500 in bonds at par, and thereupon took one thousand two hundred shares of stock, without payment, as a bonus for that purchase of bonds. He also took five hundred and sixty-seven more shares of stock in payment for coupons from his bonds which had been defaulted upon, and in January, 1889, through the assumption of some obligations, aggregating less than $7,000, he purchased from certain stockholders of the New York Cattle Company (Limited) six thousand seven hundred and seventy shares of stock and $132,500 in bonds, including $20,000 in bonds which had been purchased by one Sandford for cash from the Southwestern Land and Cattle Company. The only shares of stock for which he paid par were the five shares subscribed for by him as a corporator of the company. He subsequently parted with some

of his shares and bonds, but his estate now holds seventeen thousand five hundred and three shares of stock and $170,500 in bonds, including the $8,000 in bonds held by George F. Moore as security, presently mentioned.

William Clark took five hundred shares of stock and $5,000 in bonds as one of the stockholders of the New York Cattle Company (Limited), and five hundred more shares of stock as a bonus for the purchase of $5,000 of the bonds. He now holds $10,000 in bonds and one thousand shares of stock.

. George F. Moore bought $5,000 of the bonds but subsequently sold them to Damon. With them he received five hundred shares of stock as a bonus for his purchase of the bonds, and subsequently sixty shares more of stock, at $10 per share, in payment for interest coupons which fell due. All this stock was sold to Damon, though it yet stands in the name of Moore on the stock-book of the company. Moore claims to hold it, together with $3,000 additional in bonds, $1,000 of which Damon got from the New York Cattle Company (Limited) and the other $2,000 of which he purchased from the Southwestern Land and Cattle Company as collateral security for an indebtedness from Damon to him, hereinafter mentioned.

Damon transferred one of his bonds to J. W. Canfield, now dead, represented by W. W. Andrews, his administrator, but whether for value or not does not appear. The bond was one of those which Damon got from the New York Cattle Company (Limited) stockholders in January, 1889.

Damon also transferred to George A. Clark & Brother three bonds, for $1,000 each, which he obtained from the New York Cattle Company (Limited), but the proofs fail to show that the transfer was for value.

From its very organization the Southwestern Land and Cattle Company was under the dominion of Mr. Damon. It had directors, but they appear to have performed their duties in a merely perfunctory manner, meeting seldom and then only to resolve to clothe Damon with more abundant power and control of the company.

In May, 1889, Damon drew a note of the Southwestern Land

and Cattle Company, at four months, for $10,000, to his own order, signing it with the name of the company, by himself as its president, and, on the 1st day of June, endorsed it and presented it to the German-American National Bank of Kansas City for discount. With it he handed the bank a statement which he had previously caused William E. Hebberd to prepare, having the double purpose thereby to exhibit a solvent maker of the note and also an indebtedness from that maker to him which would justify his making the note. That statement was in the form of a letter written upon note paper with a printed heading which, among other things, states the name of the company, the announcement of the fact that W. E. Hebberd was "in charge," the address of the company's New York office and the location and address of its ranch in the Indian territory, called the "K. H. ranch."

The letter is as follows:

"New York, May 8th, 1889.

" G. F. Damon, Esq.:

"Dear Sir—In reply to your inquiry of the 13th inst. asking what sum in cash the assets of this company represent, also the amount of the company's indebtedness at this time and to whom payable, would beg to say that the assets represent a cash investment of $150,000 and that the indebtedness of the company at this time is as below:

| | |
|---|---:|
| "To G. F. Damon for advances | $10,893 36 |
| " Sundries | 1,500 00 |
| | $12,393 36 |
| " Less amount due company | 1,955 00 |
| "Net indebtedness | $10,438 36 |

"Yours truly,
"The S. W. Land and Cattle Co.,
"Per W. E. Hebberd."

Assured by Damon's representations, which were corroborated by this communication, the bank discounted the note and passed the proceeds of the discount to Damon's individual credit. In fact, at that time the total indebtedness of the cattle company to Damon was about $55, and its assets were not worth one-tenth of $150,000. With the money thus had, during the same month Damon bought eight hundred and ninety-seven head of cattle from one Toms and put them upon the cattle company's range in

charge of " K. H. ranch," taking a written acknowledgment from the foreman and auditor in charge that they were received from him. Hebberd was not informed of the issuance of the $10,000 note until it was renewed in October, 1889, and later, in November, he was instructed by Damon to enter it in the books of the company among the bills payable, who represented it to be a loan " for our company." Later in November Damon's financial affairs became so involved that he was unable to meet or adjust his obligations, and he succumbed to nervous prostration. While in this condition, on the 14th of December, after securing several creditors, he executed a general assignment to William Keating Clare for the benefit of his creditors. About this time he was greatly alarmed lest the misrepresentations he had made to the German-American National Bank would lead to criminal prosecution and possibly to his incarceration in a penal institution. He continually consulted Mr. John H. Clapp, a lawyer, who was his neighbor, and besought him to, in some way, appease the bank. According to the testimony of Mr. Clapp, he insisted that a bill of sale of the Toms cattle and some cattle purchased by him from one Goodrich, and marked K. H. 4, should be made to the bank, and prevailed upon Mr. Clapp to prepare such an instrument. It bears date on the 15th of December, 1889, and purports to have been executed on that day in the presence of Mr. Clapp, who certifies upon it in his official capacity as notary public, that on the day of its date Damon acknowledged his execution of it.

The fact that the instrument purports to have been executed prior to the general assignment to Clare, led to the taking of considerable testimony upon the contention that its date and the date of the notarial certificate of its acknowledgment were false, but since the taking of that testimony the assignment has been declared to be void and set aside by the circuit court of the United States for the southern district of New York, upon the ground that Damon did not possess mental capacity to make it. This event dispenses with the necessity of determining the question which of the two instruments, the bill of sale or the general assignment, is to have precedence.

Because of a sweeping statement in the decree of the United

States court, to the effect that on the 9th of December, 1889, and thereafter until the death of Mr. Damon, on January 20th, 1890, he was subject to delusions, his widow and executrix of his will has petitioned that she be allowed to intervene and take testimony in this proceeding to show that her husband was incompetent to make the bill of sale, and represented by the same counsel who represented the assignee, Clare, she has presented a brief upon the case originally presented to me. While I admit the executrix as party to this controversy as representing the estate of Mr. Damon, I will not now permit her to stay the determination of the issues here concerned, which will not be affected by the contest she proposes. I will first eliminate them, and then, as hereinafter indicated, will afford her an opportunity to test the validity of the instrument she questions. I have concluded not to give effect to the bill of sale, or rather, I apprehend, the chattel mortgage, for a memorandum written thereon by Mr. Clapp, to the intent that the instrument is only security for the indebtedness to the bank, appears to give it that force, because, primarily, as against the Southwestern Land and Cattle Company, I think that the possession necessary to give it validity was not taken. The German-American National Bank, the receiver and Mr. Clare, each declared their claims to the cattle, but until what is called the "round-up" and "cutting out" of the cattle in the spring of 1890, actual possession could not be had.

It is in proof that the ranch consisted of many thousands of acres of pasturage, over which the cattle, for miles, ran wild, mixing with the cattle of many owners. They were distinguishable only by their brands, those of the ranch of the Southwestern Land and Cattle Company all bearing the brand "K. H.," with additional subordinate brands of various designs to distinguish the lots or herds to which they respectively belong. The Toms cattle and the Goodrich cattle were distinguished by such brands.

By the custom of cattlemen there exists what is called a general "round-up" or gathering together of the cattle every spring, at which the brands are examined and the cattle of the several ranches and owners are separated or "cut out." At such "round-up" only, it became possible to take possession of cattle and

market them. It is not permissible to "round up" and " cut out" cattle at any other period of the year.

If cattle on the range are sold a delivery, usually recognized by cattlemen, is made by authoritative admission by the owners or lessees of the ranch to which the cattle are attached that they are held for the vendee, and subsequent actual deliveries are accordingly made at the " round-up."

After the receiver had been appointed, the German-American National Bank attempted to take possession of the Toms and Goodrich cattle. Its agent went to the ranch, there exhibited its bill of sale or mortgage, declared that he intended to take possession, rode about and saw a few of the cattle and took from the man who, until the appointment of the receiver, had been employed by the Southwestern Land and Cattle Company as foreman, at the ranch, a receipt that the Toms and Goodrich cattle were received upon the range for the German-American National Bank. That the foreman could not bind the receiver, in whom all the assets of the company were then vested, is too clear for argument. When the " round-up " in the spring came, actual possession of all the cattle was delivered to the receiver, who sold them by order of the court, and now holds the proceeds of sale subject to the legal and equitable claims upon them.

The German-American National Bank insists that it has a valid subsisting claim against the Southwestern Land and Cattle Company for the payment of the $10,000 note which Damon caused it to discount. I think it is right in its contention in this respect. It took the note in good faith for value and before maturity. It is true, upon its face the note appeared to be drawn by the president of the cattle company, to his own order, and the proceeds of the discount were used by the president to open an account in the discounting bank in his individual name. These are circumstances which challenge the good faith of the bank in the transaction (*Town of Sterling* v. *Town of Genoa, 23 N. Y. 452; Claflin* v. *Farmers' and Citizens' Bank, 25 N. Y. 293; Camden Safe Deposit and Trust Co.* v. *Abbott, 15 Vr. 257; Fifth Ward Savings Bank* v. *First National Bank, 19 Vr. 513*); but when they are considered in connection with the representations made by Damon, corroborated by the statement prepared by

Hebberd, which represented an existing indebtedness to Damon in excess of the amount of the note offered, they, at best, suggest but a suspicion, the disregard of which will not justify the conclusion that the note was taken in bad faith.    *Hamilton* v. *Vought, 5 Vr. 187; Read* v. *Abbott, 16 Vr. 303; National Bank of Republic* v. *Young, Receiver, 14 Stew. Eq. 531.*

But if the note was good in the hands of the bank against the cattle company, it clearly was unwarrantably made by Damon in abuse of his relation to that company. He had no right to .the note and no right to the proceeds of its discount, and as he used those proceeds in the purchase of the Toms cattle, I perceive no reason why I should not adjudge that a trust was impressed upon the cattle in behalf of the Southwestern Land and Cattle Company. It is true that Mr. Damon, by endorsing the note, added his credit to that of the cattle company to obtain the money, but without the liability of the cattle company he could not have had the money. That liability exceeds the fund realized from the sale. The proceeds from the sale of the Toms cattle must therefore go to the receiver.

The proceeds of the sale of the Goodrich cattle, less the reasonable charges in behalf of the cattle company and the receiver for the pasturage and care of those cattle, which are admitted by all parties to justly belong to the receiver, may be made the subject of a bill of interpleader by the receiver, to which the bank and the representatives of the estate of Damon may be the parties defendant, and in that suit there will be opportunity to contest the validity of the assignment or mortgage to the bank.

The bonds issued to the cattle company were coupon bonds, payable to bearer and transferable by delivery. According to well-established rules they had all the qualities of ordinary commercial paper; therefore, such of them as reached the hands of innocent holders for value before maturity must be held to be valid obligations of the company to the extent of the value paid for them.    *Knapp* v. *Hoboken, 10 Vr. 397; Force* v. *City of Elizabeth, 1 Stew. Eq. 406; S. C. on appeal, 2 Stew. Eq. 587; Copper* v. *Jersey City, 15 Vr. 634; Hackensack Water Co.* v. *De Kay, 9 Stew. Eq. 567; Fifth Ward Savings Bank* v. *First National Bank, 19 Vr. 513.*

It is noticed that out of the $184,500 of bonds issued, $142,000, or all but $42,500, went to the New York Cattle Company (Limited), in pursuance of the agreement for the purchase of its assets in consideration of the return of eleven thousand seven hundred and twenty-five shares of the capital stock of the Southwestern Land and Cattle Company, and that subsequently all those $142,000 of bonds became the property of Damon.

The mere statement of the transactions by which the stock and bonds were issued to the New York Cattle Company (Limited), and through that channel reached the hands of Damon, who contrived and controlled the scheme, satisfies me that the object of his acquirement of the stock and bonds for an insignificant price as compared with the par value thereof, through dishonest device, detrimental to creditors of the Southwestern Land and Cattle Company, who, if the transaction should stand as the proper disposition of the stock and bonds, would be deprived of the fund which the honestly-paid capital would have afforded them for the payment of their demands. All the value that was had for the stock of the company appears to have been about $1 a share, and for each $1,000 bond bought by the return of stock issued for that value, about the sum of $82.50.

When Damon took the $142,000 bonds from the New York Cattle Company (Limited) he knew what consideration had been paid for them, and I think that now he should not be paid more for them than that value, about $82.50 each. Because the proofs do not determinatively fix the value of the property of the New York Cattle Company (Limited) I am unable to precisely fix the amounts which should be credited as paid for the stock or as the value of the bonds in Mr. Damon's hands. Approximately, he is entitled to about $11,725 for the bonds he had from the New York Cattle Company (Limited), $20,000 for the Sandford bonds, for which Sandford paid par, and $12,500 for the bonds he bought from the Southwestern Land and Cattle Company, at par, or about $44,225 in all. But it is remembered that his estate is the holder of seventeen thousand five hundred and three shares of the capital stock of the Southwestern Land and Cattle Company, five of which shares are fully paid for, six hundred of which shares are half paid for, one thousand two hundred and

fifty of which shares he took as a bonus, with his purchase of
$12,500 in bonds, five hundred and sixty-seven of the shares
were issued to him in payment of interest coupons of the bonds
he held, and the remaining fifteen thousand and sixty-six shares
he had from the New York Cattle Company (Limited).

I am of opinion that he is liable to calls by the receiver, for
the payment of the debts of the company, upon so much of the
par value of the stock he holds as is unpaid for.   Proximately,
that liability will be the unpaid half of the six hundred shares,
or $6,000 ; that which remains unpaid upon the fifteen thousand
and eighty-six shares, about $286,584; the excess of the par
value of the five hundred and sixty-seven shares taken by him
for unpaid interest coupons over the just interest, upon the price
paid for the bonds as has been indicated, and so much as may be
necessary of the par value of the bonus stock to pay the creditors,
after the exhaustion of the sums available upon calls from the
amounts unpaid upon other shares.

As to the bonus stock, the contract between the purchaser of
bonds and the company was that he should not be called upon
to pay for the stock.   Such a contract is binding upon the com-
pany and its shareholders, but as the capital stock constitutes a
trust fund for the payment of debts, it cannot be given away
from the demands of creditors, and hence the holders of bonus
stock may be required to pay for it in satisfaction of the demands
of creditors, after the exhaustion of all other assets, upon the
ground that its issuance to them was a fraud in law upon the
creditors.  *Richardson* v. *Green, 133 U. S. 30 ; Handley* v. *Stutz,
139 U.. S. 417.*

It appears that while $44,225 may be due to the estate of
Mr. Damon, his liability to the creditors of the company, on his
various stock holdings, amounts to something in the neighbor-
hood of $330,000.   He would not be allowed to set off his de-
mand against his liability on account of his unpaid stock hold-
ing, for the reason that the assets of the company are insufficient
to pay its liabilities and the unpaid stock demands now consti-
tute a fund for the *equal benefit of all* creditors; but on the
principle which forbids such set-off there is nothing to preclude
a set-off, in behalf of the insolvent company, of the liability of

Mr. Damon against his demand, and the more so when the fact is, as it appears in this case, that Mr. Damon's estate is insolvent. *Thomp. Corp.* § *3800.*

It is quite clear that upon the application of all assets to the satisfaction of the demand against the insolvent company here, the calls upon Mr. Damon's estate must exceed his demands against the insolvent company, and hence I think that nothing should be paid at present upon his demands, but that they should hereafter, as calls may be made and established by reason of unpaid stock, be offset against those calls. In addition, I am of opinion that because of the misrepresentations made by Mr. Damon to the German-American National Bank, his entire demand should be postponed to the full payment of the bank's demand. He represented to the bank that the indebtedness of the insolvent company did not exceed $12,393.36, whereas, exclusive of his own demands and the claim of the bank, the indebtedness was in excess of that sum. The bank relied upon his statement and suffered detriment thereby, and it is inequitable that Mr. Damon's estate should assert, as against the bank, a claim in excess of it. I deem that an equitable estoppel exists in favor of the bank against Mr. Damon's estate.

Passing to the demand of William Clark. His claim for $5,000 for bonds which he purchased for cash from the company, at par, is good. His claim for $5,000 for bonds which he had as a stockholder of the New York Cattle Company (Limited) must be reduced to the value paid for those bonds, as has been indicated above. He appears to be liable to calls on account of the five hundred shares of stock he had from the New York Cattle Company (Limited) and for calls upon the five hundred shares of bonus stock, to be postponed to the exhaustion of the liabilities of all holders of other stock liable to calls. As in the case of Damon, his demand is subject to set-off upon proper calls by the receiver, and payment to him should therefore be postponed until those calls shall be made.

As to the claim of George F. Moore. In December, 1884, Mr. Moore purchased five bonds of the company, of the value of $1,000 each, for which he paid cash. With those bonds he received five hundred shares of the capital stock of the company

as a bonus.   During the year succeeding his purchase two in-
terest coupons from each of his bonds were paid.   At the end
of the second year sixty shares of capital stock were issued to
and accepted by him for $300 interest remaining unpaid.   In
1887 Mr. Moore insisted that Damon was accountable for his
unfortunate purchase, and upon his insistence Damon gave him
his (Damon's) note for the amount of the purchase, leaving with
Mr. Moore the bonds and stock as collateral security for the
payment of the note.   That note was ultimately paid, but just
before the last payment upon it, in December, 1888, Damon pro-
posed to Mr. Moore that he and Moore should go into a cattle
speculation.   The money necessary for it was a little over $6,000,
which was to be contributed equally by Damon and Moore,
Moore discounting Damon's note for the $3,000 Damon was to
contribute, to secure which discount or loan the five hundred and
sixty shares of stock and the five bonds, with three additional
bonds of $1,000 each, making in all eight bonds, were left with
Mr. Moore as collateral security for the payment of Damon's
note and also, as Mr. Moore alone testifies, for the security of
Moore from all loss in the speculation.   The money in excess
of $3,000 which was used in the speculation was paid by Damon.
In 1890 the cattle thus bought were sold by Mr. Moore for
$4,340.25, from which sum he proposes to deduct $1,660.82 for
the expense of selling the cattle.   The proofs do not justify such
a deduction.   It is almost impossible to say what a proper charge
for the expense of sale would be, but I think, upon consideration
of the whole testimony, that an allowance of $1,200 in that be-
half will be ample.

   The claim that the bonds and stock were to be held by Moore
as security from all loss to him in the speculation is supported
by the testimony of Moore alone, as to conversations with Damon
and has been received under objection in behalf of the repre-
sentatives of the estate of Damon that he is not a competent wit-
ness to testify to any conversations with Damon to establish a
liability against them.   I think that the objection is well taken.
They are parties in this proceeding.   They are here to assert and
defend the rights of Damon.   Damon's estate is entitled to all

Hebberd v. Southwestern Land and Cattle Co.

the proceeds from these bonds and stock in excess of that which is chargeable against them in behalf of Mr. Moore, and, so far as the interests of Damon are concerned, the executors of his will virtually here sue and are sued in a representative capacity. I think, therefore, that his testimony in the particular referred to was incompetent under the act of 1880. *Rev. Sup. p. 287.*

This being so, Mr. Moore has shown that he should have credit only for $3,000, with interest from the maturity of Damon's note, and that he should be charged with $3,140.25, proceeds of sale of cattle, with interest from the time when the same was released. If there be a difference in his favor the dividend upon the amount due upon the bonds and stock in his hands will be used in the payment thereof. The excess of the dividend over that amount must be credited to Damon and be dealt with as in case of his other similar holdings of bonds and stock. Seven of the bonds are to be treated, with reference to him, as fully paid for in cash, and the remaining bond, which was had from the New York Cattle Company (Limited), will be reckoned as similar bonds held by him are. Mr. Moore, however, will not be paid a dividend until the receiver shall have made such calls upon the stock unpaid for as may be necessary. Under such calls Mr. Moore must answer for the five hundred shares of bonus stock. *The Germania National Bank v. Case, 99 U. S. 628; Thomp. Stock. 288.*

It does not appear whether the bonds transferred by Damon to J. W. Canfield and George A. Clark & Brother were transferred to them as innocent purchasers for value. They were bonds which he had from the New York Cattle Company (Limited), and proof that value was paid for them is necessary to enable the amount due upon them to be ascertained.

The situation of other claims presented to the receiver has not been discussed before me. I understand that there are other claims, some having a preference in payment, but that their adjustment is not involved in the matter herein treated of, and that they do not affect the questions considered.