### CLARK v. JOHNSON et al.

### In re OZARK LAND & LUMBER CO.

(Circuit Court of Appeals, Eighth Circuit. July 25, 1917.)

No. 4838.

1. BANKRUPTCY ⊛52—COURTS OF BANKRUPTCY—EQUITABLE NATURE OF PROCEEDINGS.

   Bankruptcy proceedings are in the nature of proceedings in equity, and bankruptcy courts administer the law according to the spirit of equity.

2. CORPORATIONS ⊛243(1)—STOCKHOLDERS—LIABILITY OF INNOCENT PURCHASERS OF UNPAID STOCK.

   Bankrupt, an Arkansas corporation, issued stock, which was delivered to the purchaser of its bonds, without other consideration. All of the stock was placed for 10 years in the hands of voting trustees, who issued certificates which recited that the holder at the end of 10 years was entitled to full-paid stock to the face value, and prior to that time to any dividends declared on the certificate. Claimants purchased certain of the bonds in the open market in New York, and received with them a proportionate amount in the voting trust certificates; they had no knowledge of the stock, nor the manner of its issuance. Held that, as bona fide purchasers of the bonds with the certificates, they did not become liable as subscribers for unpaid stock to assessment for the benefit of creditors of the bankrupt.

Appeal from the District Court of the United States for the Western District of Arkansas; F. A. Youmans, Judge.

In the matter of the Ozark Land & Lumber Company, bankrupt. From an order allowing the claims of James D. Johnson and others, bondholders, Perry N. Clark, trustee, appeals. Affirmed.

⊛For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

F. M. Etheridge, of Dallas, Tex. (W. N. Ivie and Duty & Duty, all of Rogers, Ark., and Etheridge, McCormick & Bromberg, of Dallas, Tex., on the brief), for appellant.

Henry L. Fitzhugh, of Ft. Smith, Ark. (Joseph M. Hill and John Brizzolara, both of Ft. Smith, Ark., on the brief), for appellees.

Before SANBORN, CARLAND, and STONE, Circuit Judges.

CARLAND, Circuit Judge. This is an appeal from an order of the District Court allowing claims of appellees against the estate of the Ozark Land & Lumber Company, a bankrupt. The facts which condition the validity of the claims are as follows:

The Ozark Land & Lumber Company was incorporated under the general law of the state of Arkansas, November 26, 1910, with a capitalization of $150,000, divided into 6,000 shares, of the par value of $25 each. It was represented in the articles of incorporation that the following named persons had subscribed for shares of stock in said corporation as follows: George D. Locke, 4,000 shares; J. W. Walker, 200 shares; J. S. McCleod, 200 shares; R. C. Hobbs, 1,400 shares; and W. W. Moody, 200 shares. None of these subscribers ever paid anything on his stock subscription. The certificate of incorporation recited that the stock "is to be paid by installments, in such proportion and at such time as the directors shall think proper."

On November 29, 1910, W. R. Felker sold to the corporation 12,152.37 acres of land in the counties of Benton, Madison, and Washington, Ark., for $150,000 and 5,950 shares of its capital stock. As payment therefor the corporation gave Felker six notes, for $25,000 each, and secured the payment of the same by a mortgage on the land, and thereafter, on May 18, 1912, issued certificates of stock to Felker, amounting to 5,950 shares. The other 50 shares were disposed of by donating 10 shares to five individuals to qualify them as directors. In the latter part of 1911, or the early part of 1912, Felker and George D. Locke, president of the corporation, entered into negotiations with Smith & Potter, dealers in investment securities in New York City, which resulted in an agreement that the corporation should increase its capital stock from $150,000 to $300,000; that it should issue 150 bonds, of $1,000 each, secured by a first deed of trust to the Mississippi Valley Trust Company of St. Louis, Mo., upon all of the land purchased by the corporation from Felker; that Smith & Potter should buy the bonds at 90 cents on the dollar for those delivered by the Trust Company prior to March 1, 1912, and 90 cents with accrued interest for those delivered subsequent to said date; that the corporation should donate to Smith & Potter the increased capital stock of $150,000, and in addition thereto Felker should donate to them 50 shares of the original issue of stock, the proceeds arising from the sale of the bonds to be received and accepted by Felker in discharge of the notes given for the purchase price of the land.

This agreement was carried out. The corporation amended its charter, increasing its capital stock from $150,000 to $300,000. The stockholders and directors voted the increase, and resolved that for

the purpose of facilitating the sale of the bonds the $150,000 increased capital stock be distributed among the subscribers and purchasers of said bonds as they were paid for, allotting to each subscriber 40 shares of stock, of the par value of $25 each, to each bond, which were of the denomination of $1,000 each. At the stockholders' meeting Felker voted 5,950 shares and the other five stockholders 10 shares each.

On January 25, 1912, a deed of trust to the Trust Company, as trustee, was executed, and the 150 bonds were issued, but dated January 2, 1912. They were deposited with the Trust Company, which upon the order of George D. Locke, president of the corporation, transmitted them to the Standard Trust Company of New York, to be delivered to Smith & Potter upon payment by them therefor. Smith & Potter paid for the bonds at various dates between February 6 and July 2, 1912. The proceeds of the bonds were appropriated by Felker, in consideration of which he canceled the six $25,000 notes and his mortgage to secure the same. The bonus stock was not issued at the time of the execution of the bonds or the deed of trust to secure the same; it being agreed apparently that the bonus stock was not to be issued until the bonds were paid for. The bonus stock was issued in May, 1912, to Smith & Potter. Prior to the issuance of the bonus stock to Smith & Potter, the stockholders of the corporation, including Smith & Potter, entered into a "voting trust agreement," dated May 1, 1912. By virtue of this trust agreement the stockholders placed their stock irrevocably for a period of 10 years in the hands of voting trustees.

It was further provided in the trust agreement that the stock held by any stockholder who should become a party to the trust agreement should be deposited with the Trust Company hereinbefore mentioned, and that the stockholders should receive in exchange therefor voting trust certificates to be signed by the voting trustees and the Trust Company; that all shares of stock should be transferred upon the books of the corporation to the voting trustees. Pursuant to this agreement Smith & Potter with other stockholders transferred the stock held by them to the voting trustees and received therefor voting trust certificates corresponding with the amount of stock transferred.

It is claimed that the transfer of stock was made by canceling the original certificates of stock and issuing new certificates direct to the voting trustees. The voting trust certificates recited on their face that on the 1st day of May, 1922, the holder of any certificate would be entitled to receive a certificate or certificates of stock for the number of shares of fully paid stock in the corporation called for by the trust certificate or the proceeds thereof if the same had been sold as provided in the voting trust agreement dated May 1, 1912, and that in the meantime each holder should receive payment equal to the dividends, if any, declared by the voting trustees upon a like number of shares standing in their names, and that until the actual delivery or sale of such certificates of stock the voting trustees should possess and should be entitled to exercise all rights of every name and nature, including

the right to vote thereon in respect to all such stock. The voting trust certificate provided that it should be transferable by the registered holder thereof, either in person or by an attorney upon surrender thereof at the office of the Trust Company only on the books of the voting trustees and in accordance with the rules and regulations established for that purpose, and that until so surrendered the voting trustees might treat the registered holder thereof for all purposes as the owner of all right, title, and interest of every character therein. Between February 6, 1912, and July 2, 1912, Smith & Potter sold the bonds purchased by them and a portion of the trust certificates representing shares of increased stock to appellees in the following amounts:

| Purchasers. | No. Bonds. | Par Value. | V. T. Cert. | Par Value. |
|---|---|---|---|---|
| D. L. Whitmore | 40 | $40,000 | 800 | $20,000 |
| J. H. Birch | 40 | 40,000 | 1,068 | 26,700 |
| H. G. McFaddin | 10 | 10,000 | 300 | 7,500 |
| G. W. Carroll | 10 | 10,000 | 200 | 5,000 |
| F. C. Foster | 10 | 10,000 | 200 | 5,000 |
| James D. Johnson | 15 | 15,000 | 300 | 7,500 |
| John L. Bassett | 7 | 7,000 | 140 | 3,500 |
| John H. Folk | 7 | 7,000 | 280 | 7,000 |
| Sidney Thursdy | 3 | 3,000 | 60 | 1,500 |
| R. A. Powers | 2 | 2,000 | 100 | 2,500 |
| W. G. French | 6 | 6,000 | 160 | 4,000 |
| | 150 | $150,000 | 3,608 | $90,200 |

The evidence for appellees is to the effect that the bonds and voting trust certificates were purchased by them as one transaction, and that the money paid by them was for the joint purchase of the bonds and voting trust certificates. It appears, however, that Smith & Potter, although they were entitled to the stock by agreement, did not receive the same until some time in May, 1912, and did not receive all of the voting trust certificates until some time in July, 1912. This, however, would not show that the trust certificates were not in fact purchased at the same time as the bonds, as the trust certificates could have been sold to be delivered when Smith & Potter should receive them. The amount which each appellee paid for his bonds and trust certificates does not appear, but it is safe to presume that they paid more than Smith & Potter. Johnson and Powers, two of the bondholders, testified that they purchased the bonds held by them and the voting trust certificates on the open market in New York City, without knowledge that the stock represented by the voting trust certificates had not been paid for; that at the time of purchase nothing was said about this matter one way or the other. Frank A. Potter, of the firm of Smith & Potter, testified that he had heard the testimony of Johnson and Powers, and that all the bonds and stock in controversy were sold in the same manner. The referee found also that the corporation sold the bonds to Smith & Potter.

Appellees' claims are based upon the above-mentioned bonds. The referee in bankruptcy, on objection of the trustee, decided that the allowance of the amount due upon the bonds should be stayed until it might be determined what assessment was due from appellees to

the creditors of the bankrupt on the stock held by them; the appellees being regarded by the referee as subscribers to the capital stock of the corporation in the amount of the trust certificates, whose subscriptions had not been paid, thereby invoking the doctrine that unpaid stock subscriptions pass to the trustee in bankruptcy and that the stock of an insolvent corporation is a trust fund for the benefit of the creditors of the corporation. The record shows that the indebtedness of the corporation is in round numbers $311,000 and the appraised value of its assets $212,000.

On petition for review the District Court reversed the order of the referee, and decided that, if appellees could be considered as subscribers for the capital stock of the corporation under the circumstances, nevertheless, under the Constitution of Arkansas, the stock was null and void and conferred no rights or imposed liabilities. From this decision the trustee appealed.

The claim of counsel for appellant may be stated in this way: Appellees purchased the voting trust certificates, or received them as a bonus, with knowledge that the stock represented thereby had not been paid for, or with knowledge of facts which, if investigated, would have led to such knowledge; that under such circumstances the law would imply a contract on the part of appellees to pay for the stock represented by the voting trust certificates; and that, therefore, appellees are liable to be assessed in such an amount upon their stock that, when added to the total assets of the corporation in the hands of the trustee, would pay the creditors of the corporation in full.

Counsel for appellees claim that their clients purchased the voting trust certificates in the open market under such circumstances as would constitute them bona fide purchasers of the same from Smith & Potter, to whom they had been issued by the voting trustees, and therefore they are not subscribers for unpaid stock and not liable to any assessment in behalf of the creditors of the corporation. They also maintain, and this view seems to have been adopted by the trial court, that by virtue of section 8 of article 12 of the Constitution of Arkansas the shares of stock represented by the voting trust certificates were null and void, and therefore no rights or liabilities can arise thereon. The section of the Constitution above referred to reads as follows:

"No private corporation shall issue stocks or bonds, except for money or property actually received or labor done, and all fictitious increase of stock shall be void."

The increase of the capital stock of the corporation seems to have been regularly made under the laws of Arkansas. The corporation had power to increase its stock as it did, and, if it is null and void, it must be by virtue of the section of the Constitution above quoted. Section 8 has not been construed, so far as we are advised, with reference to the conditions existing in the present case, by the Supreme Court of Arkansas; but the Supreme Court of the United States in Memphis & Little Rock Ry. Co. v. Dow, 120 U. S. 287, 7 Sup. Ct. 482, 30 L. Ed. 595, used the following language in reference thereto:

"Recurring to the language employed in the Arkansas Constitution, we are of opinion that it does not necessarily indicate a purpose to make the validity of every issue of stock or bonds by a private corporation depend upon the inquiry whether the money, property, or labor actually received therefor was of equal value in the market with the stock or bonds so issued. It is not clear, from the words used, that the framers of that instrument intended to restrict private corporations—at least, when acting with the approval of their stockholders—in the exchange of their stock or bonds for money, property, or labor, upon such terms as they deem proper, provided, always, the transaction is a real one, based upon a present consideration, and having reference to legitimate corporate purposes, and is not a mere device to evade the law and accomplish that which is forbidden."

[1] In view of the above language and the case of Handley v. Stutz, 139 U. S. 417, 11 Sup. Ct. 530, 35 L. Ed. 227, we are not prepared, nor do we find it necessary, to decide that the increased stock was fictitious within the meaning of the Constitution. We prefer to place our judgment upon the proposition that appellees are not, and never have been, subscribers to the capital stock of the corporation. Bankruptcy proceedings are in the nature of proceedings in equity, and bankruptcy courts administer the law according to the spirit of equity. Bardes v. Hawarden Bank, 178 U. S. 524, 20 Sup. Ct. 1000, 44 L. Ed. 1175; Lockman v. Land, 132 Fed. 1, 65 C. C. A. 621; In re Broadway Savings Trust Co., 152 Fed. 152, 81 C. C. A. 58; Ogden v. Gilt Edge Mining Co. (8th Cir.) 225 Fed. 723, 140 C. C. A. 597.

Although we are obliged to deal in this case with the legal corporate entity called the Ozark Land & Lumber Company, still, when we look through the legal form of this entity, we can see no one but Felker. The money of appellees paid the notes of Felker to the amount of $150,000, and now it is proposed by the trustee in bankruptcy to compel them to pay to the estate of Felker in round numbers $90,000 more, in order that they may receive back from said estate the money which they advanced to pay said notes. Fair dealing would require, in our opinion, a very strong case to accomplish such a result, especially when the assessment to be levied would be used to pay indebtedness incurred by Felker before the issuance of the increased stock. Let us now see what the transaction was between appellees and Smith & Potter.

[2] Appellees did not purchase shares of stock. They purchased in the open market at the city of New York, in connection with the purchase of their bonds, certain voting trust certificates, issued by voting trustees and the Trust Company, wherein it was recited that in 10 years the holder of the voting trust certificate would be entitled to receive fully paid up shares in the corporation to the amount represented by the trust certificate; that in the meantime the holder of the trust certificate should be entitled to receive payments equal to the dividends, if any, collected by the voting trustees. The names of appellees never appeared upon the books of the corporation as stockholders, and the corporation never treated them as stockholders. What is a purchaser in New York City to rely upon, if he cannot rely upon the statements of the trust certificate? We do not think appel-

lees, or either of them, were compelled in order to be bona fide purchasers to travel to the state of Arkansas for the purpose of investigating the affairs of the corporation. The truth is they never intended to become subscribers for stock of the corporation.

It is urged that, when Smith & Potter transferred their stock to the voting trustees, the old stock was canceled and new stock was issued directly to the trustees, and that by virtue of the trust agreement the voting trustees were constituted the agents of the stockholders, and therefore appellees, when they purchased the trust certificates, stood in the same relation to the corporation as Smith & Potter; but, when the stock was issued to the voting trustees, the latter were the agents of Smith & Potter, not of appellees. It is not shown that appellees knew anything about how the stock was handled by Smith & Potter. We are clearly of the opinion that, so far as the record before us is concerned, appellees had a right to rely upon the statement in the voting trust certificate that the stock represented by the certificate was fully paid. The further statement that the holder of the voting trust certificate would be entitled to dividends during the 10 years was entirely contrary to the idea that it was unpaid stock. We find the law upon the subject under discussion stated in Cook on Corporations (7th Ed.) vol. 1, § 50, as follows:

"A bona fide purchaser for value and without notice of stock issued by a corporation as paid up cannot be held liable on such stock in any way, either to the corporation, corporate creditors, or other persons, even though the stock was not actually paid up as represented. Such a purchaser has a right to rely on the representations of the corporation that the stock is paid up. * * * Where, however, a statement is made on the face of the certificate that it is paid-up stock, the bona fide purchaser of the certificate need not inquire further, but may rely on that representation, and is protected thereby against liability. * * * The law goes still further, and holds that where a person in open market, in good faith and without notice, purchases certificates, such stock is to be deemed 'paid up' in his hands, and he is protected as a bona fide purchaser, even though there is nothing on the face of the certificates stating that they are paid up. This can now be laid down as the established rule. It is based on sound public policy, favoring, as it does, the transfer of personal property, and the quasi negotiability of stock, and discountenancing secret liens and constructive notice. A purchaser in open market of stock represented to be paid up by a statement to that effect on the certificate is presumed to be a bona fide purchaser. Hence there has arisen the well-established rule, both in America and England, that a bona fide purchaser for value, and without notice, of stock issued as paid up, is not liable for any part of the par value which may not have been paid. In a case where parties receiving stock and bonds from the corporation in payment for property sold the bonds with a bonus of stock, the Supreme Court of the United States held that the purchasers were not necessarily purchasers with notice."

Many authorities are cited in support of the above statement of the law. Thompson, Commentaries on the Law of Corporations, vol. 3, §§ 2934, 3223, states the law in the same way. See, also, section 177, Helliwell on Stockholders; Morawetz on Corporations, § 161; and Clark & Marshall on Private Corporations, 1741.

Counsel for appellant suggest that all this law may be eliminated by quoting the following lines from section 2934, vol. 3, Thompson on Corporations:

"But all these decisions assume that the stockholder sought to be charged purchased the shares after they had been issued and put on the market as paid-up shares. They have no application to the case of an original subscriber."

We may suggest that these lines may be eliminated by treating appellees as purchasers of stock, and not as original subscribers, which in our judgment the record clearly shows.

In our opinion, law and justice require the affirmance of the judgment below; and it is so ordered.