O’NIELL, J.
Defendant has appealed from a judgment for $5,000, with legal interest from the 10th of March, 1913, rendered against him on the theory of his having been a subscriber for shares of stock issued, by a corporation for services that were supposed to have been rendered but were not worth the par value of the stock.
Plaintiff, as receiver of the corporation, styled the Hydro-Carbon Gas Company, Incorporated, alleged in his petition that the supposed services, for which the shares of stock were issued to defendant, were not rendered ; and that, by accepting the shares of stock, defendant became a subscriber, or rendered himself liable as a delinquent'subscriber would be liable, for the payment of the par value of the stock in cash. It was not alleged that defendant was guilty of fraud or misrepresentation, or that he or the corporation obtained credit or any other benefit or advantage from any one, or that any one was imposed upon or suffered any loss or disadvantage, by or in consequence of the transaction in which the boarcl of directors issued the shares of stock.
Before answering tire petition, defendant filed an exception of no cause or right of action ; which was overruled. Answering the suit, he admitted that he had received the shares of stock and averred that the services which he had given to the corporation were well worth the shares of stock. I-Ie averred that, if the court should conclude otherwise, he stood ready and willing to surrender the stock certificates for cancellation.
The judge of the civil district court did not render a written opinion in the case, or give reasons for his judgment, except to say that he was guided by the ruling of this court, overruling an exception of no cause of action, in the case of the Dilzell Engineering & Construction Co. v. Lehmann, 120 La. 273, 45 South. 138.
The facts of the case before us, so far as they are pertinent to the question of defendant’s liability, are not disputed. The HydroCarbon Gas Company was incorporated for the object and purpose of purchasing the patent right to a certain gas burner, called the “Little Wonder Gas Maker,” and for the purpose of manufacturing and selling the burners. The patent right was bought from R. I. McKissack, for $4,390.75, of which $1,000 had been paid for the option. For the balance of the price, McKissack collected all of the money received by the corporation for stock subscriptions and for sales of gas burners, as fast as the money came in, until he had collected all but $240.75 of the amount due him. Then he sued for the appointment of a receiver, averring that the directors of the corporation had issued about $20,000 of watered stock. The suit was filed within four months after the company was incorporated, and resulted in the appointment of the receiver. McKissack also claimed that the corporation owed him $200 for two months’ salary as consulting engineer. Five other parties intervened in the suit for a receivership, averring that the corporation owed them, respectively, $610, $165.68,' $534, $659.59, and $536.-99. The total, therefore, of all claims that have been asserted against the corporation, amounted to $2,947.01; and none of them has been established by proof. A year and a month after the receiver was appointed, he filed a petition in court, averring that he had succeeded in collecting only $400 for the corporation ; that he had sold all of the property of the corporation, except the patent right, which, he alleged, was worthless. Therefore he prayed for and obtained a reduction of his bond from $5,000 to $500.
From the foregoing statement, it is manifest that defendant did not — nor did any one else^ever render services worth $5,000 to the corporation. Whether the services that were rendered by defendant and his associates would have become valuable to the *151 corporation and its stockholders if McKissaclc had been more lenient is a matter of conjecture. The evidence shows, beyond any doubt, that the shares of stock which defendant received for the services that he did render were not worth anything. If the stock had ever become valuable, its value would have been the result of the services that were rendered and were being rendered by defendant and his associates, in soliciting stock subscriptions, selling gas burners, and promoting the business and welfare of the corporation and of themselves as stockholders.
Defendant was not an officer or a director of the corporation when he received the shares of stock for the services that the directors acknowledged he had rendered. He acquired from the corporation 70 shares of stock, of the par value of $700, for which he paid the corporation $700 in cash; and he was elected president of the corporation some time, perhaps a month, after the $5,000 of stock was issued to him for the services he had rendered. In the resolution to issue the shares of stock to defendant for the services he had rendered, the same amount of stock was given to each of five other persons for services rendered. It was stated in the resolution that the six men referred to had secured valuable patent rights for the corporation, had done all of the “groundwork” for the successful operation of the corporation, and had rendered valuable services in financing the corporation, without which, it was said in the resolution, the corporation could not have carried out the objects or purposes for which it was formed. The attorney of the corporation was consulted at the time and advised that the proposed issue of stock to the six promoters of the corporation would be a legitimate transaction. Two of the promoters to whom stock was thus issued were directors of the corporation, and it was by their vote alone — they being a majority and constituting a quorum of the board of directors— that the resolution was adopted. It does not appear, however, that the receiver has ever sued to cancel their stock or to compel them to pay for it. In fact, as far as the record shows, the defendant in this case is the only person against whom proceedings have been brought, either to cancel a stock certificate or to collect for an uniraid subscription.
Before filing the suit, plaintiff, as receiver of the corporation, prayed for and obtained an order of court authorizing him to sue five of the promoters named, including this defendant, merely for a cancellation of the stock certificates. At the same time, and in the same petition, he prayed for and obtained authority to sue delinquent subscribers, on their subscription contracts, for the amount of their unpaid subscriptions, respectively. The first, second, third, and fourth paragraphs of the petition for authority to bring the suits asked for authority to sue the five promoters named, including this defendant, merely for a cancellation of their stock certificates; and the fifth, sixth and seventh paragraphs asked for authority to sue delinquent subscribers, on their subscription contracts, for the amount of their unpaid subscriptions, respectively. The allegations of the petition were:
“(1) That, at a meeting of the board of directors of the said company held on March 19, 1913, it was decided to issue, in compensation for services supposed to have been rendered in the promotion of said Hydro-Carbon Gas Company, $5,000 worth of capital stock to each of the following men: William G. Brothers * * * [and the four others named].
“(2) That the services for the compensation of which this stock was issued were not in fact rendered.
“(3) That, since no services were rendered for the stock issued, the men to whom the issue of stock was made are not entitled to it, and, therefore, the stock ought to be cancelled.
“(4) That petitioner desires to be author-', ized to demand the surrender of, or payment for, said stock, and, in default thereof, to bring *153 suit for the surrender and cancellation of same.
“(5) That your receiver holds, as receiver, contracts for subsciptions to the capital stock of said Hydro-Carbon Gas Company, and that said subscriptions are due and remain unpaid.
“(6) That it is necessary to make demand for payment on the subscribers whose subscriptions remain unpaid, and, in the event said subscribers refuse or neglect to make payments a's per contract, to bring suit on said subscription contracts.
“(7) That your petitioner desires to be authorized to demand the payments of the subscriptions, and, in the event that the subscribers refuse or neglect to make payments, to bring suit.”
The prayer of the petition was for authority to sue for cancellation of the stock held by the five promoters named, including this defendant, and to sue the delinquent subscribers, on their subscription contracts, for the amounts of their unpaid subscriptions. The authority was granted, as prayed for; • and the attorneys for the receiver made written demand upon defendant, either to pay for the stock or to surrender it for cancellation. The receiver’s attorneys stated in their letter that, if defendant would deliver the stock certificates to the receiver, at his office, he would grant a receipt in full. Defendant called at the office of the receiver and offered to surrender his stock certificates for cancellation, provided the receiver would call in ahid cancel the stock certificates that had been issued to the other promoters for the same consideration. The receiver thereafter brought this suit, not for cancellation of the stock, but for $5,000 in money.
Pretermitting the question whether the receiver might have instituted this suit without special authority from the court, his method of proceeding shows that he and his attorneys recognized that defendant was not under any obligation to pay $5,000 in cash for the stock he had received. Aside from that view of the case, the receiver had no cause or right of action to demand that defendant should pay $5,000 in cash for the stock he had received. A personal action must he founded upon one of the four causes that give rise to personal obligations, as stated in article 28 of the Code of Practice, viz. a contract, a quasi contract, an offense, or a quasi offense. It is or must be conceded that defendant was not under any contract or quasi contract to pay $5,000 in money for, the shares of stock; and it is not contended or ‘pretended that he committed any offense or quasi offense in accepting the shares of stock for the services he had rendered. In fact, it was proven and is not contradicted that he did render faithful services to the corporation. The only complaint is that the services were not worth $5,000 in money.
Article 266 of the Constitution of 1898, and the corresponding article -of the Constitution of 1913, stated the consequence of a corporation’s issuing stock or bonds except for labor done or for money or property actually received (and the provisions are retained in section 2 of article 13 of the Constitution of 1921, almost verbatim), viz.:
“No corporation shall issue stock or bonds, except for labor done or money or property actually received, and fictitious issues of stock shall be void, and any corporation issuing such fictitious stock shall forfeit its charter.”
The liability of a subscriber for stock in a corporation - rests upon the obligation of his contract, independent of the constitutional penalty or consequence of a corporation’s issuing fictitious stock.
The decision in the case of the Dilzell Engineering & Construction Co. v. Lehmann, on which the judge of the civil district court rested his judgment in this case, is not at all appropriate to the facts of this case. The defendants in the case cited, according to the allegations' of, the petition, which was held to disclose a cause of action, had deliberately defrauded the plaintiff, Dilzell Engineering & Construction Company, by inducing the plaintiff to give credit, for more than *155 $7,000, to a corporation styled Athletic Park & Amusement Company, by declaring falsely that they, the defendants, and the other stockholders of the corporation, had paid $50,000 in cash for their shares .of stock, when in fact the corporation had a paid-up capital of only $3,200. The allegations of the petition, in detail, if taken for true, showed that a palpable fraud and imposition had been committed by the defendants upon the plaintiff, in consequence of which plaintiff had parted with $7,109.70. For that, it was held that the petition disclosed a cause of action. The defendants, being directors of the corporation, had issued to themselves shares of stock to the amount of $30,100, for which they had pretended to pay the par value, when in fact they had only given property of very little value. The cause of action of the creditor, Dilzell Engineering & Construction Company, in that case, was founded upon an'alleged quasi offense — if not upon a genuine offense on the part of the defendants. The quotations in the opinion in the case cited, taken from the opinion of the Supreme Court of the United States, in Handley v. Stutz, 139 U. S. 417-428, 11 Sup. Ct. 530, 537, 30 L.Ed. 234, are apt to be misleading, without full knowledge of the facts of the case. The suit was brought by creditors of an insolvent corporation, some of whom had become creditors before, and some after, the directors of the corporation had increased the capital stock and issued some of the shares as a bonus to the subscribers for the bonds of the, corporation, and distributed the balance of the shares among themselves, the directors, without paying any consideration whatever for the stock. It was held that the creditors who had become creditors after the corporation’s capital stock was increased had a cause of action, but that those who were creditors before the stock was increased had no cause to complain. On that subject, the court said:
“Wo have no doubt the learned circuit judge held correctly that it was only subsequent creditors who were entitled to enforce their claims against these stockholders, since it is only they who could, by any legal presumption, have trusted the company upon the faith of the increased stock.”
The court held that the directors who had distributed a part of the increase of capital stock among themselves, without giving any consideration for the stock, were liable to the creditors who had become creditors after the stock was increased; but that the sub-' scribers to the corporation’s bonds, who had received,, as a bonus, shares of stock equal in amount to the bonds subscribed and taken by them, were not liable, as delinquent stock subscribers, even to the creditors who had become creditors after the stock -was increased.
One of the quotations in the Dilzell Casev taken from the opinion in Handley v. Stutz, is not complete, and might therefore be misconstrued, viz.:
“The wholesome doctrine that the capital stock of a corporation is a trust fund for the payment of its debts, rests upon the idea that the creditors have a right to rely upon the-fact that the subscribers to such stock have put into the treasury of the corporation in some form the amount represented by it.”
Here is' exactly what the court said on the subject, viz.:
“The wholesome doctrine, so many times enforced by this court, that the capital stock of an insolvent corporation is a trust fund for-the payment of its debts, rests upon the idea that the creditors have a right to rely upon the fact that the subscribers to such stock have put into the treasury of the corporation, in some form, the amount represented by it; but it does not follow that every creditor has a right to trace each share of stock issued by such corporation, and inquire whether its. holder, or the person of whom he purchased,, has paid its par value for it.”
The ruling in the Dilzell Engineering &. Construction Company’s Case, therefore, does not sustain plaintiff’s contention that the de-‘ *157 fendant in this case became liable, as a subscriber, for the payment of $5,000 in cash, by his acceptance of shares of stock for that amount, in payment for services rendered that were not worth the $5,000. And the ruling in Handley v. Stutz, to the contrary, maintains that the defendant in this case is not liable as a subscriber for the stock he received.
We do not understand why the court gave judgment against defendant for $5,000, on any theory suggested in the opinion rendered in the Dilzell Engineering & Construction Company’s Case. It was said in that^case that the directors of the insolvent corporation, who were said to have issued watered stock to themselves, and to have committed a fraud upon the plaintiff, would not be liable, in solido, but only jointly, in' proportion to the shares of stock received by each, and not beyond the amount -of the debts of the corporation, tinder that doctrine, the defendant here, who received only a sixth of the stock that was issued to the six promoters of the corporation, would be liable only for a sixth of the debts contracted by the corporation with persons who were, either in fact or presumably, deceived. There is no proof of any such debts in the case before us. The total amount of claims asserted against the corporation is less than $3,000. It is not certain whether those claims arose before or after the stock was issued to the promoters of the corporation. The evidence shows affirmatively, and it is not contradicted, that no credit was ever given to the corporation on any one’s faith in its paid-in capital. If all of the claims that have been asfcerted against the corporation were established by proof — if all of them arose after the shares of stock were issued to the promoters of the corporation, if all of the supposed creditors of the corporation acted upon their faith in the supposed paid-in capital stock of the corporation, and if the doctrine of the Dilzell Engineering & Construction Company’s Case is sound in that respect— defendant’s liability would be less than $500.
Our conclusion, however, is that defendant is not obliged, as a subscriber might be, to pay cash for the shares of stock that were issued to him for services rendered, even though the services were not worth the par value of the stock.
The judgment appealed from is annulled, and plaintiff’s demand is rejected and his suit is dismissed,'- at the cost of the corporation he represents.