## MALLERY v. MANAGERS' SECURITIES CO.
### No. 850.

District Court, D. Delaware.
Dec. 7, 1932.

Aaron Finger (of Richards, Layton & Finger), of Wilmington, Del., and Hal H. Smith, of Detroit, Mich., for plaintiff.

Hugh M. Morris, of Wilmington, Del., for defendant.

NIELDS, District Judge.

Harvey J. Mallery, a holder of class B stock in Managers' Securities Company, a Delaware corporation, filed his bill against that corporation for an accounting involving a multiplicity of transactions and complicated accounts. The controversy relates to the determination of the proper amount of assets of defendant apportionable upon dissolution to class B stockholders and to the rights of plaintiff in those assets.

In 1923 a vice president of General Motors Corporation conceived a plan for arousing and sustaining the zeal, enthusiam, fidelity, and loyalty of managing executives of that company. E. I. du Pont de Nemours & Co., holding 7,500,000 shares of General Motors stock through its subsidiary, General Motors Securities Company, was deeply interested in the plan and was ready to co-operate by selling to defendant stock of its subsidiary being the equivalent of 2,250,000 shares of General Motors stock at $15 a share. To carry out this plan Managers' Securities Company, the defendant, was incorporated November 26, 1923. The charter authorized the issuance of $28,800,000 in 7 per cent. cumulative preferred stock and $4,000,000 in class A stock, divided into 40,000 shares, par value $100, and $1,000,000 in class B stock divided into 40,000 shares, par value $25. These three classes of stock were issued. Upon the organization of defendant on November 26, 1923, and continuously thereafter, its officers were a few of the officers of General Motors Corporation. Its directors were likewise a few of the officers or chief executives of General Motors. Approximately seventy of the managing executives of General Motors or of its subsidiaries became the stockholders of defendant.

November 27, 1923, the day after its organization, defendant entered into a contract with General Motors Corporation, commonly referred to as the "5 after 7 contract." It provided: "General Motors hereby agrees on or before April 1st in each year, commencing with April 1st, 1924 and ending April 1st, 1931, to pay to the Managers Company 5% of the net earnings of General Motors for the preceding calendar year after deducting from said net earnings 7% on the capital employed during said year." On the same day, November 27, 1923, the du Pont Company agreed to sell to the defendant 148,509 shares of the stock of its subsidiary, General Motors Securities Company, being the equivalent of 2,250,000 shares of General Motors stock.

All of class A and class B stock of the defendant was sold to General Motors Corporation for $5,000,000 in cash. This sum so acquired by the defendant (less $50,000) was paid by the defendant to the du Pont Company, and the $28,800,000 of preferred stock of defendant was delivered to the du Pont Company for stock of General Motors Securities Company, representing 2,250,000 shares of General Motors stock. This preferred stock was later retired. To accomplish the ultimate purpose of the plan, General Motors resold in large part the class A and class B stock of defendant to some seventy or more selected executives of General Motors or of its subsidiary companies. They uniformly acquired the same number of class A and class B shares. The plaintiff, one of such executives, purchased 200 shares of class A and 200 shares of class B. General Motors required each purchaser of class A and class B stock at the time of purchase to give to it an irrevocable option enabling it to reacquire such stock. Plaintiff executed and delivered such an option. The option on the class A stock provided that if the plaintiff should leave the employ of General Motors or its subsidiary, through no fault of his own, the General Motors Corporation could buy the class A stock at a price equivalent to its par value plus its proportion of the class A surplus "as shown on the books of the company as of April 30th" in the year in which the repurchase was made. In 1929 this option was exercised upon plaintiff leaving defendant's employ and plaintiff continued the holder of class B stock only.

The business of the defendant was to administer for the benefit of its stockholders two sources of income: (1) The shares of General Motors Securities Company, the equivalent of 2,250,000 shares of General Motors stock acquired from the du Pont Company; and (2) the "5 after 7 contract" yielding bonus payments to be distributed among defendant's class A stockholders while they remained in the service of General Motors Corporation and no longer.

Nothing more need be said as to the purchase of the block of General Motors stock from the du Pont Company. We are more concerned in this case with the other asset of defendant, the "5 after 7 contract" and the earnings of General Motors Corporation received by defendant under that contract. We are concerned with the agreement between the stockholders of defendant contained in its charter relative to its earnings. The charter provided: "There shall be credited to a Class A surplus account, for the benefit of the Class A stock, on the books of the Company, when and as received, the net amount, after providing for taxes, earned by the Company under said contract with the General Motors Corporation wherein General Motors Corporation agrees, under the terms and conditions therein set forth, to pay this Company, for the term therein specified, five percent (5%) of its net earnings after certain deductions. Said Class A surplus may be used for the payment of special dividends on Class A stock, or for the purpose of retiring such Class A stock pro rata either in whole or in part at any time at a price equal to the par value thereof plus its pro rata share of said Class A surplus account. All the remaining net income of the Company shall be credited to a general surplus account."

From the start a "Class A Surplus Account" was set up on defendant's books. Its income under the "5 after 7 contract" was credited on the books to that account as required by its charter. Its remaining income was credited to a general surplus account. Dividends on class B stock were paid from and charged against the general surplus account. Dividends paid on class A stock were paid from and charged against class A surplus account. Defendant's income was very large. By the summer of 1926 its preferred stock had all been retired. By 1928, 30,000 shares of class A stock were retired from income received under the "5 after 7 contract." The charter of defendant was amended reducing defendant's authorized capital to $2,000,000 consisting of 10,000 shares of class A stock and 40,000 shares of class B stock.

Starting with 1925, a meeting of stockholders was held in Detroit in January or February of each year. At these meetings a statement of earnings with balance sheets were presented together with charts dealing with probable earnings, dividends, etc. Voluminous exhibits were produced comparing the assets, earnings, and dividends of defendant, General Motors, and other corporations. Reports were made to the stockholders by the officers and the business of the company was fully discussed. These were the only meetings where the operations of the company and its financial condition were presented personally to the stockholders. At the stated annual meetings in Wilmington only a sufficient number of stockholders attended to hold the meetings, the vast majority of the stockholders being represented by their proxies.

January 24, 1928, Mr. Sloan, president of defendant, issued a notice addressed "To Stockholders Managers Securities Company," stating:

"The usual annual meeting, if I may term it such, at which we get together and discuss the progress made during the previous year, will take place this year in the Board of Directors Room, General Motors Building, Detroit, on Tuesday, February 7th, at 2 P. M. Will you please notify me promptly as to whether or not you will be able to be present.

"If at all possible, I should appreciate your being with us. We only get together once a year and it is a great help to each one if all are there. These meetings give us an opportunity to discuss our progress and what we hope for, not only during the current year, but for the future as well."

Approximately 75 per cent. of the stockholders of defendant were present at this meeting. Each stockholder owned class A and class B stock in like proportions. Three-fourths of the class A stock being retired, an original owner of 200 shares of each class of stock like plaintiff would hold at this meeting 50 shares of class A and 200 shares of class B. Mr. Sloan presided.

No regular minutes were kept of the above meeting. However, in a letter to stockholders of defendant of April 5, 1928, Mr. Sloan stated:

"It will be remembered by those who were at the meeting in February, that a question of policy arose which I might state as follows:

"The indebtedness of Managers Securities Company having been liquidated, should the bonus payments pass to the Stockholders or should such payments be reinvested for the benefit of the Stockholders?

"It was unanimously decided, there being no dissenting opinion when I put the question, that the Stockholders preferred to have the payments in question reinvested in the common stock of General Motors Corporation. As a part of the discussion the fact was brought out that, in principle, the market value of the securities of reasonably well managed corporations appreciates over a period of years and, that being the case, it was deemed desirable to purchase sufficient stock to absorb earnings on account of General Motors Corporation payments, borrowing money for that purpose, and retiring the indebtedness gradually as such payments were received. This suggestion appeared to be received favorably and, in due course, a resolu-

tion was adopted leaving the matter in the hands of the Directors of the Company."

That the words "bonus payments," used in the foregoing resolution, meant payments under the "5 after 7 contract" or the class A surplus is perfectly clear from the evidence in the case, and is in accordance with the terms of the charter and the testimony of the vice president of defendant who conceived the plan. "There was a very important purpose served" said the vice president "in creating the two classes of stock on the part of Managers Securities Company, Class A and Class B. * * * General Motors Corporation recognized that in the event where an individual holding Class A stock of Managers Securities Company ceased to be actively engaged in services to General Motors Corporation, that then it would become absolutely imperative that General Motors Corporation repurchase that Class A stock, because otherwise the equivalent of bonus money would be allowed to flow to an individual not actively rendering services to the General Motors Corporation. That is the explanation of the peculiar and unusual provisions in respect to Class A stock of Managers Securities Company. So that as the plan was designed and the manner in which these two classes of stock, A and B, there was afforded to the General Motors Company the opportunity at its election upon the retiring of an executive, or for any reason that the General Motors Corporation might seek, to stop the flow of bonus money to the individual, the opportunity was left clearly open to General Motors Corporation to act merely in the way of purchasing the Class A stock and thereby nullifying the bonus payment and leaving the Class B stock in the hands of the individual by which he would be allowed to fare for better or worse according to the appreciation in the values in the assets of the Managers Securities Company."

Pursuant to the resolution of the stockholders, the directors instructed the officers of the defendant to borrow $25,000,000 from J. P. Morgan & Co. and to give its note therefor. Accordingly on March 8, 1928, the note was made; 168,300 shares of General Motors stock were purchased for $25,144,075. The annual report for the year ending April 30, 1928, referred to the purchase in the words: "This stock is carried separately on the balance sheet at cost." Later in that year General Motors increased its capital and issued 2½ shares of new common stock for each share of old. The purchase of the 168,-

300 shares thereby became converted into 420,750 shares.

December 18, 1928, the assistant secretary of defendant wrote to the stockholders: "It is contemplated that the contract payment to be received from General Motors Corporation on or about April 1, 1929, will be applied towards retirement of the indebtedness of the company." The only indebtedness of the company at that time was the $25,000,000 note. March 14, 1929, the vice president of defendant reviewed the situation in a letter to the stockholders. He said: "Last year the Company purchased 168,300 shares of General Motors common stock (equivalent to 420,750 shares of the present $10 par value common stock) at a cost of $25,144,075.00, and borrowed from bankers $25,000,000 to cover the cash requirement. This $25,000,000 loan from bankers was outstanding at the beginning of this year, and represented the entire indebtedness of your Company other than liability for Federal income taxes. * * * We have made arrangements with the bankers to pay off $8,500,000 of the present outstanding loans, and have extended the balance ($16,500,000) to April 1, 1930."

In accordance with the terms of the above letter, $8,500,000 was paid March 14, 1929, and the balance of $16,500,000 was paid April 1, 1930. That the class A surplus afforded the funds with which to pay the note sufficiently appears from a statement of that account in the footnote.[1]

No dividends were paid to class A stockholders from earnings under the "5 after 7 contract" during the two-year period while the $25,000,000 note was being liquidated. Such dividends had been paid before and were paid after that period. Moreover, within that period $34,200,000 in dividends was paid to class B stockholders from the general surplus showing that the note could have been paid from that surplus if class B stockholders had been so minded.

Did class A stockholders or class B stockholders own the 420,750 shares of General Motors stock? This is the crux of the case. Plaintiff contends that this purchase was solely for the account of class A stockholders and should have been allocated to them; that this stock was paid for with the proceeds of the "5 after 7 contract" belonging solely to class A stockholders, so that whatever profit or loss was incident to the purchase must accrue to or be borne by the class A stockholders. On the other hand, defendant, conceding that the income received from the General Motors contract was credited on the books to class A surplus as required by defendant's charter, contends that all of defendant's income, both dividends on stock and the proceeds of the General Motors contract, were "put into a common fund," that "there was no provision for separate bank accounts for the corporation's income," and that "there was never any earmarking of assets." Defendant insists that the proceeds of the General Motors contract were general assets of the corporation, that the purchase of the General Motors stock was a purchase by the corporation, and that this stock became a general asset of the corporation along with its other assets. If plaintiff's contention is sound, it is unnecessary to consider the subsequent amendment to defendant's charter, or plans for reorganization and steps for dissolution.

Both parties rely upon defendant's charter. Obviously this case may be determined by a consideration thereof. A charter is a contract between the company and its stockholders. It is also a contract between the stockholders inter sese. Morris et al. v. American Public Utilities Co., 14 Del. Ch. 136, 144, 122 A. 696. Defendant's charter provides that receipts from the General Motors contract shall be credited to the class A surplus account "for the benefit of the Class A stockholders." The charter further provides that the class A surplus shall be used for the payment of dividends on the class A stock and for the purpose of retiring class A stock. There is a definite limitation in the use of receipts from the General Motors contract which does not apply to the other assets.

[1] 1927

| | | | | | | |
|---|---|---|---|---|---|---|
| Dec. 31, | "Class A Surplus" balance | | | | $ | 348,732.78 |
| 1928 | | | | | | |
| Mar. 31, | Income under G. M. contract | | | | | 9,072,181.87 |
| Mar. 14, | " | " | " | " | | 7,040,000.00 |
| 1929 | | | | | | |
| Mar. 31, | " | " | " | " | | 3,879,563.57 |
| 1930 | | | | | | |
| Apr. 1, | " | " | " | " | | 8,960,015.50 |
| Mar. 22, | Proceeds from sale of 139,900 shares of G. M. stock, part of 1928 purchase | | | | | 5,611,941.46 |
| | | | | | | $34,912,435.18 |
| 1928 | | | | | | |
| Apr. 16, | Redemption of 20,000 shares of Class A stock | | | $4,900,000 | | |
| Jan. 5, | Dividends on Class A stock | | | 2,100,000 | | |
| Mar. 14, | Dividends on Class A stock | | | 2,100,000 | | |
| 1930 | | | | | | |
| Sept. 15, | Dividends on Class A stock | | | 330,000 | | |
| Dec. 15, | Dividends on Class A stock | | | 330,000 | | 9,760,000.00 |
| | | | | | | $25,152,435.18 |

Class A stockholders having agreed with the class B stockholders in and by defendant's charter that the proceeds of the "5 after 7 contract" should constitute a separate fund for the sole benefit of class A stockholders, it follows as a necessary legal consequence that the investment of that fund is for the sole account of class A stockholders.

Class A stockholders are likewise bound by their subsequent agreement at the meeting in Detroit in February, 1928. When the question "should the bonus payments pass to the Stockholders or should such payments be reinvested for the benefit of the Stockholders" was put before the stockholders at that meeting, it is clear the question was submitted for action to the class A stockholders because they were the only stockholders having any legal interest in the bonus payments. All class A stockholders (each of whom at that time was also a class B stockholder) present at the meeting agreed that the future payments from the "5 after 7 contract" should be used to buy General Motors stock and that they would forego dividends from payments under that contract until the debt to be created to buy the stock should be discharged. Further, all stockholders of defendant were informed of the action taken at the meeting and no one of them at any time made objection. Under these circumstances all stockholders, both class A and class B, are bound by the action taken at this meeting. Handley v. Stutz, 139 U. S. 417, 423, 11 S. Ct. 530, 35 L. Ed. 227.

Defendant contends that the receipts from the General Motors contract were general assets because they were not earmarked. By "earmarking" apparently is meant being set aside in a special fund specially labeled. Such earmarking is not necessary. The receipts from the contract were credited to class A surplus and nowhere else. It is immaterial that the check from General Motors corporation may have been deposited in defendant's general banking account. All that can possibly be necessary to determine the rights as between class A and class B stockholders is that an appropriate account be kept indicating the rights of each in the corporate assets. Such accounts were kept. It is of no significance that the earnings from the General Motors contract were not segregated in kind from other assets of the corporation. It is sufficient that they were segregated on the books of the company and thereby earmarked if not branded.

I find that the 420,750 shares of General Motors stock purchased by defendant belonged to and was part of class A surplus. It follows that in ascertaining the proper amount of assets apportionable upon dissolution to class A and class B stockholders, whatever profit or loss was incident to the purchase of the above stock must accrue to or be borne by class A stockholders and should not be shared by class B stockholders of which class plaintiff is one.

If the parties can agree upon the share of defendant's assets to which plaintiff is entitled, under the foregoing opinion a final decree may be submitted; otherwise, the case will be referred to a master.